471 A.2d 1058

Crystal CONAWAY

v.

**SOCIAL SERVICES ADMINISTRATION.**

**No. 149, Sept. Term, 1982.**

Court of Appeals of Maryland.

March 8, 1984.

**640**

Ethel Zelenske, Baltimore, for appellant.

Margaret E. Rawle, Asst. Atty. Gen., Baltimore, (Stephen H. Sachs, Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

COLE, Judge.

The issue presented in this case is whether the Baltimore City Department of Social Services may use federal benefits conserved for a foster child as reimbursement for the cost of past care. The facts can be recounted briefly.

Crystal Conaway was committed to the custody of the Baltimore City Department of Social Services[1] (DSS) and placed in the foster care program in 1967 at the age of six. Conaway resided in the foster home of Ms. Evelyn Walker until he reached the age of majority. During this period Ms. Walker received foster care payments from DSS.

Because his father was a veteran and also fully insured under the Social Security Act, Conaway became entitled to certain benefits when his father became totally disabled. In

---

1. The Baltimore City Department of Social Services is the local arm of the Social Services Administration which is the component of the Maryland Department of Human Resources responsible for foster care. [Hereinafter the Social Services Administration will be referred to as the State.]

1967 Conaway began receiving veterans' benefits, and in 1970 he also began to receive social security benefits on his father's account. These benefits varied in amount over the years, ranging from a total of approximately $73.00 to $83.00 per month. All payments ended in 1979, when Conaway reached the age of eighteen.

Federal regulations provided that Conaway's benefits could be used as payment for the cost of his care.[2] Because Conaway was a minor, the director of the local Department of Social Services was named as the representative payee for these benefits. Thus, the checks were deposited in the account of DSS. However, State regulations provided that such benefits could be conserved for the foster child beginning at the age of twelve to be used for the child's future educational or vocational needs.[3] In 1975 DSS began conserving Conaway's federal benefits in a trust fund account established in his name.[4] Disbursements from this account were made to Conaway for various educational programs including driving school, modeling school and music schools.

In September 1981, the State proposed amendments to COMAR 07.02.11.07 providing that benefits received by foster children could no longer be conserved in total but would be applied toward the cost of foster care. Only money in excess of the cost of foster care would be conserved. Funds already conserved under the prior policy would be retained as long as the child continued in foster care and held to the original plan. Under that policy, if the child remained in foster care and was still attending school after reaching age eighteen the funds would be used to pay for his educational needs. If the child was not in school, the account would be applied toward the cost of foster care.

---

2. *See, e.g.,* 20 C.F.R. § 404.2040.

3. COMAR 07.02.11.07(B)(4) (1980).

4. Due to agency error, the funds were not conserved beginning in 1973 when Conaway reached the age of 12. However, later the funds were conserved retroactively to 1973.

In line with the new emphasis of its regulations, the State issued Circular Letter No. 82–11 directing local department directors to recoup immediately all conserved funds of foster children age eighteen and over not attending school on September 1, 1981. Conaway was warned of the consequences of not continuing school in May 1980, and after turning eighteen, he received a notice of intended action from DSS in November 1981, which informed him that:

> Your conserved funds will be reverted back to this agency to pay for the cost of your foster care, because you were not enrolled in an educational or training program as of September 1, 1981. This is the money that had been conserved for your education, from your benefits from the Veterans' Administration and the Social Security Administration.

Conaway appealed this decision and a hearing was held on January 7, 1982, before a Department of Human Resources hearing examiner. Conaway testified that he planned to continue with his training and had been accepted at a data processing institute. He also raised several legal arguments, namely that he was not financially liable for the cost of his foster care in the absence of statutory authority and that DSS's intended seizure of his conserved funds violated provisions of the Social Security Act and the Veterans' Benefits Act and their implementing regulations. However, the hearing examiner concluded that the local department could apply conserved funds as reimbursement for the cost of prior foster care.[5]

---

5. However, the examiner noted that the local department had improperly determined how reimbursement should be computed. Instead of making a monthly comparison between the amount of Conaway's income and foster care payments, the department compared the total cost of foster care against the total benefits received. Therefore, the hearing examiner did not uphold the local department's action, but rather ordered it to recompute whether there were any excess benefits in the fund. This analysis showed that Conaway's benefits had exceeded costs in only one month, in the amount of $6.80; thus, $3,371.11 in its account could revert to the local department.

Conaway appealed to the Baltimore City Court (now and hereinafter Circuit Court for Baltimore City), raising the same legal arguments he had asserted below. That court affirmed the hearing examiner's decision. Conaway entered a timely appeal; we granted certiorari before a decision was reached in the Court of Special Appeals. We now reverse the judgment of the Circuit Court for Baltimore City.

Conaway first argued in the proceedings below that he was not financially liable for the cost of his foster care in the absence of statutory authority creating such liability. Because no Maryland statute created liability, he maintained that as a matter of State law he could not be compelled to reimburse the State for payments properly made on his behalf.

Several courts have held that unless authorized by law individuals are not required to reimburse a state for public assistance. *See Ogdon v. Workmen's Comp. A.B. San Bernardino Cty. W.D.,* 11 Cal.3d 192, 113 Cal.Rptr. 206, 520 P.2d 1022 (1974); *State Department of Social Welfare v. Dye,* 204 Kan. 760, 466 P.2d 354 (1970); *In re Estate of Colon,* 83 Misc.2d 344, 372 N.Y.S.2d 812 (1975); *Neunz v. Summit Cty. Children Services Bd.,* 54 Ohio St.2d 218, 8 Ohio Ops.3d 193, 375 N.E.2d 798 (1978); *Spokane County v. Arvin,* 169 Wash. 349, 13 P.2d 1089 (1932). Article 88A of the Maryland Code does not establish a child's liability to reimburse the State for foster care payments made on his behalf, even though liability is created for welfare benefit recipients. *See* Md. Code (1957, 1979 Repl.Vol., 1982 Cum.Supp.), Art. 88A, §§ 63 *et seq.* Therefore, a beneficiary of foster care payments should not be required to reimburse the State for the costs of his assistance after he has reached the age of majority and has been able to accumulate assets. As we see it, obtaining reimbursement from subsequently acquired assets is by implication unauthorized by this statute.

However, the situation presented in this case is quite different. The State is not seeking to recoup benefits from the recipient's subsequently acquired assets. Rather, the

State seeks to use funds that it previously acquired (which it could have used when first received) to reimburse itself for the cost of care. This procedure is authorized by regulation and does not otherwise violate State law.

As noted above, the State followed the procedure outlined in COMAR 07.02.11.07. Furthermore, the relevant statute authorizes the procedure as having the force of law. Article 88A, § 5(a) provides that the State Director of Social Services may "adopt from time to time such rules and regulations as may be necessary to carry out any of the duties imposed upon him by law, and when adopted, . . . such rules and regulations shall have the force and effect of law." Article 88A, § 60 authorizes various payment rates for foster care; however, it does not delineate the source(s) of the funds to be used. The State Director of Social Services is responsible for administering these aspects of the foster care program. Therefore, regulations about foster care payment rates and the source of funds to make these payments are necessary to carry out duties imposed by law. The regulation at issue in this case has accomplished precisely that. COMAR 07.02.11.-07 is entitled "Resources for Reimbursement towards Cost of Care." Federal benefits were paid to the State and could have been used to pay for the cost of the child's care. These benefits were committed to the department for the child's benefit. As resources that could offset the cost of care, their use was a proper subject for regulation. Because these regulations were within the statutory authority, they had the force of law; thus, they provided an adequate legal basis for the local department's actions.

■ However, Conaway argues that federal statutes and regulations prohibit DSS from seizing his benefits to reimburse itself for past care. 38 U.S.C. § 3101(a) (1976) dealing with veterans' benefits provides:

Payments of benefits due or to become due under any law administered by the Veterans' Administration shall not be assignable except to the extent specifically authorized by law, and such payments made to, or on account

of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary.

A similar provision applies to social security benefits. 42 U.S.C. § 407 (1976) provides that:

The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

We have not previously determined whether these provisions of federal law prohibit the State from using federal benefits that it has conserved to reimburse itself for past care. However, in *State, Central Collection v. Stewart,* 292 Md. 255, 438 A.2d 1311 (1981), this Court did consider whether the State could obtain a judgment against persons found not guilty of crimes by reason of insanity for the cost of care and treatment rendered in the State mental hospital to which they were committed. These patients received social security benefits and the State subsequently sought reimbursement. We concluded that 42 U.S.C. § 407, as construed in *Philpott v. Essex County Welfare Board,* 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973), precludes benefits from being subject to any type of legal process. However, in *Stewart,* the State had not attempted to reach any benefits. Instead, a judgment simply was entered against the patients. Even though at the time the patients' only source of income was the social security benefits, these benefits were not actually attached; therefore, we found no violation of § 407.

The instant action is quite different from *Stewart* because in this case benefits in fact were seized. Therefore, we must

re-examine *Philpott* and its analysis of the requirements of § 407.

In *Philpott*, Wilkes applied to a New Jersey welfare agency for financial assistance. As a condition of receiving assistance, Wilkes was required to execute an agreement to reimburse the county welfare board for all payments received. Wilkes began receiving the State assistance by 1967 and was advised to apply for social security benefits. In 1968 Wilkes was awarded retroactive social security disability benefits in the amount of $1,864.20. The money was deposited in a bank account and the county welfare board sued to reach the bank account under the reimbursement agreement. The trial court held that the welfare board was barred by § 407 from recovering any amount from the account. The New Jersey Supreme Court reversed. In reversing that court, the U.S. Supreme Court stated that "[o]n its face, the Social Security Act in § 407 bars the State of New Jersey from reaching the federal disability payments paid to Wilkes." *Id.* at 415, 93 S.Ct. at 592.

The Court reasoned that the language in § 407 is all-inclusive and then disposed of the State's arguments:

New Jersey argues that if the amount of social security benefits received from the Federal Government had been made monthly, the amount of state welfare benefits could have been reduced by the amount of the federal grant. We see no reason to base an implied exemption from § 407 on that ground. We see no reason why a State, performing its statutory duty to take care of the needy, should be in a preferred position as compared with any other creditor. Indeed, since the Federal Government provides one-half of the funds for assistance under the New Jersey program of disability relief, the State, concededly, on recovery of any sums by way of reimbursement, would have to account to the Federal Government for the latter's share.

The protection afforded by § 407 is to "moneys paid" and we think the analogy to veterans' benefits exemptions which we reviewed in *Porter v. Aetna Casualty Co.,* 370

U.S. 159 [82 S.Ct. 1231, 8 L.Ed.2d 407], is relevant here. We held in that case that veterans' benefits deposited in a savings and loan association on behalf of a veteran retained the "quality of moneys" and had not become a permanent investment. *Id.*, at 161–162 [82 S.Ct. at 1232–1233].

In the present case, as in *Porter,* the funds on deposit were readily withdrawable and retained the quality of "moneys" within the purview of § 407. The Supreme Court of New Jersey referred to cases where a State which has provided care and maintenance to an incompetent veteran at times is a "creditor" for purposes of 38 U.S.C. § 3101, and at other times is not. But § 407 does not refer to any "claim of creditors"; it imposes a broad bar against the use of any legal process to reach all social security benefits. That is broad enough to include all claimants, including a State. [*Id.* at 416–17, 93 S.Ct. at 592–93 (footnote omitted).]

Thus, the Court held that New Jersey could not reach the accumulated federal benefits paid to Wilkes.

Although certain factual distinctions are presented in the case *sub judice,* we find the Court's decision in *Philpott* determinative of this case. Here Conaway's benefits were in a trust fund account established in his name, not in his personal account. Also, the funds were received while Conaway was being provided with assistance, not after he already had received it. However, these distinctions are irrelevant to the application of § 407. Regardless of when money is paid to the beneficiary, benefits are clearly "moneys paid ... under this subchapter." Benefits do not lose their protected status simply because they are accumulated by the State in a trust account for the beneficiary instead of being accumulated by the social security administration and retroactively paid to the recipient. Similarly, the type of account in which the benefits are held does not affect the analysis under § 407 unless the funds can no longer be considered "moneys paid" pursuant to the subchapter. These funds were Conaway's benefits, which had simply

been sent to DSS as representative payee. When conserved in the trust fund account, they remained "moneys paid."

Furthermore, the Supreme Court's analysis in *Philpott* clearly indicates that these funds could not have lost their quality as "moneys" while on deposit in the agency's account. Benefits lose the quality of moneys only after they have taken the form of permanent investments. *See Porter v. Aetna Casualty & Surety Co.,* 370 U.S. 159, 82 S.Ct. 1231, 8 L.Ed.2d 407 (1962). The funds in issue did not become permanent investments and lose the quality of moneys because they were readily withdrawable on Conaway's behalf by the representative payee.

The State stresses that DSS had a legal right to use the benefits to offset Conaway's costs of care and maintenance; thus the money in the trust account legally belongs to the agency. However, a similar argument was rejected by the Court in *Philpott*. There the State argued that if the amount of social security benefits received had been made monthly, the amount of State welfare benefits would have been reduced by the amount of the federal benefits. The State could have made such a reduction; however, the Court saw "no reason to base an implied exemption from § 407 on that ground." *Philpott, supra,* 409 U.S. at 416, 93 S.Ct. at 592. Similarly, in this case, the State had the right to use current benefits for current costs of care. However, the State manifestly did not follow this course. Instead, it chose to conserve the benefits for Conaway. Once accumulated, the benefits took on the same character as those in *Philpott;* thus, that Court's conclusion also applies in this case: "We see no reason why a State, performing its statutory duty to take care of the needy, should be in a preferred position as compared with any other creditor." *Id.* As the Supreme Court has made clear, a state agency has no authority to take lump sum federal benefits and use them for reimbursement for past care. The State had an obligation to provide for Conaway; it cannot now seek reimbursement from funds which it could have used, but chose not to.

Other provisions of federal law and regulations adopted pursuant thereto support our conclusion. As representative payee on behalf of Conaway, DSS had certain duties defined by regulation pursuant to 42 U.S.C. §§ 405 and 1302 (social security benefits) and 38 U.S.C. §§ 210 and 3202 (veterans' benefits).[6] Although these regulations indicate that benefits may be used for the current needs of the beneficiary, the Social Security Administration Programs Operations Manual System § 00603.001 (1981) specifically provides that:

If a payee used his own funds for current support of the beneficiary and saves or invests the beneficiary's social security benefits, the payee ordinarily cannot later use those conserved benefits to reimburse himself for his prior support of the beneficiary. The beneficiary's right to a conservation of benefits may not be made contingent upon his special use of it. For example: A father conserves a child's social security benefits upon condition that she goes to college. Instead, she marries upon completion of high school. The conserved funds still belong to the child.

This Social Security Administration policy clearly applies in the case *sub judice*. DSS could not make its conservation of Conaway's benefits contingent on his special use of them. Thus, the agency could not appropriate the funds to compensate itself for costs of past care when Conaway did not immediately continue his education upon reaching age eighteen.

Therefore, Maryland law conflicts with the mandate of the federal laws we have examined. To the extent that our regulations conflict with these federal statutes, they must be deemed invalid pursuant to the Supremacy Clause.[7]

---

**6.** *See* 20 C.F.R. § 404.2001 *et seq.;* 38 C.F.R. § 13.1 *et seq.*

**7.** The Supremacy Clause is embodied in Article VI of the U.S. Constitution which provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be

■ The Supreme Court in *Philpott* reversed the judgment of the New Jersey Supreme Court because of the Supremacy Clause. That clause requires courts to consider the validity of state laws in light of treaties or federal laws touching the same subject. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). The Court in *Perez v. Campbell,* 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971), outlined the test to be used in determining whether the Supremacy Clause is applicable: "Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." [8]  Having construed the statutes and regulations involved, we conclude that applying Maryland law under the facts of this case conflicts with federal law.

Therefore, based on the Supremacy Clause we hold that COMAR 07.02.11.07(B)(4)(c), which allows the State to use conserved federal benefits for reimbursement of past foster care costs, is preempted by 38 U.S.C. § 3101(a) and 42 U.S.C. § 407 which prohibit the State from seizing such benefits for reimbursements.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. MAYOR AND CITY COUNCIL OF BALTIMORE TO PAY THE COSTS.

---

bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

**8.** This Court has recognized that under the Supremacy Clause we must determine whether federal laws in a particular field preclude a state from enforcing its statute. *Ward v. State,* 280 Md. 485, 374 A.2d 1118 (1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978).