709 A.2d 142

**Georgette ROBERTS et al.**

**v.**

**TOTAL HEALTH CARE, INC.**

**No. 76, Sept. Term, 1996.**

Court of Appeals of Maryland.

May 14, 1998.

500

Saul E. Kerpelman, Baltimore, for petitioner.

Monte Fried (Tracey D. King, Wright, Constable & Skeen, L.L.P., on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI *, RAKER and WILNER, JJ.

ELDRIDGE, Judge.

This case arose out of the lead poisoning of two minor children in 1987. Specifically, the case involves a dispute regarding the payment of the children's medical expenses, which were paid by Total Health Care under contract with the State of Maryland through its Medicaid program. Total

---

* Karwacki, J., now retired, participated in the hearing of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of the opinion.

Health Care has asserted a statutory and equitable subrogation claim against a tort settlement received by the children in connection with the poisoning, to recoup the amount it paid to treat the children.

## I.

The State of Maryland, through the Department of Health and Mental Hygiene, provides comprehensive medical health care assistance to low-income persons who meet certain eligibility requirements. *See* Maryland Code (1982, 1994 Repl. Vol., 1997 Supp.), §§ 15–101 through 15–124 of the Health–General Article. Most relevant to this case is the provision that, to be eligible for benefits under the program, recipients are deemed to have assigned to the State any rights to payment for medical care from legally liable third parties. Section 15–109(d) currently states as follows:

"(d) *Automatic assignment of benefits.*—As a condition of eligibility for medical assistance, a recipient is deemed to have assigned to the Secretary of Health and Mental Hygiene or the Secretary's designee any rights to payment for medical care services from any third party who has the legal liability to make payments for those services, to the extent of any payments made by the Department on behalf of the recipient."

Additionally, § 15–120 grants the State a right of subrogation to any cause of action which a program recipient has against a third party for payment of medical services. At all times relevant to the resolution of this case, § 15–120 stated as follows:

"**§ 15–120. Subrogation claims.**

"(a) In general.—If a Program recipient has a cause of action against a person, the Department shall be subrogated to that cause of action to the extent of any payments made by the Department on behalf of the Program recipient that result from the occurrence that gave rise to the cause of action.

"(b) Holding money for Department.—(1) Any Program recipient or attorney, guardian, or personal representative

of a Program recipient who receives money in settlement of or under a judgment or award in a cause of action in which the Department has a subrogation claim shall, after receiving written notice of the subrogation claim, hold that money, for the benefit of the Department, to the extent required for the subrogation claim, after deducting applicable attorney fees and litigation costs.

"(2) A person who, after written notice of a subrogation claim and possible liability under this paragraph, disposes of the money, without the written approval of the Department, is liable to the Department for any amount that, because of the disposition, is not recoverable by the Department. * * *"

Thus, § 15–120(a) grants the Department a right of subrogation to any claim that a program recipient may have against a third party, where the third party's actions resulted in medical care for which the Department paid. Section 15–120(b)(1) requires the program recipient or the recipient's attorney to hold funds sufficient to satisfy the Department's subrogation claim from any judgment or settlement proceeds received, upon receiving notice of the subrogation claim from the Department. Finally, § 15–120(b)(2) states that, if anyone required by § 15–120(b)(1) to hold the funds disposes of them, that person will become personally liable on the Department's claim if the Department is later unable to recover the money. Under this section, if after receiving notice of a subrogation claim under § 15–120(a), an attorney releases settlement funds to a client without holding back an amount sufficient to satisfy the subrogation claim, and the Department later is unable to recover the funds from the client, the attorney will be personally liable.

Sections 15–109 and 15–120 represent the State of Maryland's effort to comply with the federal law on medical assistance, which requires states to seek reimbursement for medical assistance payments made where a third party is legally liable for that medical care. *See* 42 U.S.C. § 1396a(a)(25)(B) (1994) (State plan for medical assistance must provide that "in

any case where [third party] legal liability is found to exist after medical assistance has been made available on behalf of [a program recipient] and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency will seek reimbursement for such assistance to the extent of such legal liability"); 42 U.S.C. § 1396a(a)(25)(I) (1994) (State plan for medical assistance must provide that "the State has in effect laws under which, to the extent that payment has been made under the State plan for medical assistance for health care items or services furnished to an individual, the State is considered to have acquired the rights of such individual to payment by any other party for such health care items or services"); 42 U.S.C. §§ 1396a(45) and 1396k(a)(1)(A) (1994) (State plan must require a program recipient "to assign the State any rights . . . to support (specified as support for the purpose of medical care by a court or administrative order) and to payment for medical care from any third party"); 42 C.F.R. §§ 433.135 through 433.154 (1997).[1]

As part of its medical assistance program, the Department contracts with Health Maintenance Organizations (HMOs) to

---

**1.** Many States have statutory schemes similar to § 15–120, based on these Federal requirements. *See, e.g.,* Ala.Code § 22–6–6 (1997); Alaska Stat. § 47.05.070 (1996); Colo.Rev.Stat. § 26–4–403 (1997 Supp.); Conn. Gen.Stat. § 17b–265 (1997); Fla. Stat. ch. 409.910 (1998); Ga. Code Ann. § 49–4–149 (1994); Haw.Rev.Stat. § 346–37 (1993 Repl., 1997 Supp.); Idaho Code § 56–209b (1997 Supp.); Ill.Rev.Stat. ch. 215, para. 105/8 (1993); Ind.Code §§ 12–15–8–1 through 12–15–8–9 (1997); Iowa Code § 249A.6 (1994, 1998 Supp.); Kan. Stat. Ann. § 39–719a (1993); Me.Rev.Stat. Ann. tit. 22, § 14 (West 1992, 1997 Supp.); Mass. Gen. L. ch. 18, § 5G (1996); Minn.Stat. § 256B.37 (1992, 1998 Supp.); Miss.Code Ann. § 43–13–125 (1993); Neb.Rev.Stat. § 68–716 (1996); N.J.Rev.Stat. § 30:4D–7(k) (1997); N.M. Stat. Ann. § 27–2–23 (Michie 1997 Supp.); N.Y. Social Services Law § 104–b (Law. Co-op 1984); N.C. Gen.Stat. 108A–57 (1997); Ohio Rev.Code Ann. § 5101.58 (1996, 1997 Supp.); S.C.Code Ann. §§ 43–7–420, 43–7–430, 43–7–440 (Law. Co-op 1997 Supp.); S.D. Codified Laws Ann. § 28–6–7.1 (1997 Supp.); Tenn.Code Ann. § 71–5–117 (1995 Repl.Vol., 1997 Supp.); Tex. Hum. Res.Code Ann. § 32.033 (West 1990); Vt. Stat. Ann. tit. 33, § 1906–1907 (1997 Supp.); Wash. Rev.Code Ann. § 74.09.180 (1994); W. Va.Code § 9–5–11 (1998); Wis. Stat. § 49.89 (1997, 1998 Supp.); Wyo. Stat. §§ 42–4–201 through 42–4–208 (1997).

provide medical services to medical assistance recipients, in exchange for monthly per capita payments to the HMO. *See* Code (1982, 1994 Repl.Vol., 1997 Supp.) §§ 15–103(b)(2)(i), 15–103(b)(18)(i) of the Health–General Article. The Department entered into such a contract with Total Health Care.[2] The contract between the Department and Total Health Care contained the following provision:

"9. Third-party Liability

"a. If an enrollee [program recipient] under the terms of this contract has a cause of action against a person, the HMO–MA shall be subrogated to that cause of action to the extent of any payments made, or costs incurred, by the HMO–MA on behalf of the enrollee that result from the occurrence that gave rise to the cause of action. Costs incurred by the HMO–MA may be considered as including the HMO–MA's reasonable and customary charges for services furnished by the HMO–MA's own staff or that of subcontractors.

"b. The Department intends hereby to assign to the HMO–MA its right of subrogation under section 15–120, Health–General Article, *Annotated Code of Maryland,* but only to the extent to which these rights are assignable under the laws of Maryland. The Department accepts no liability for the failure or inability of the HMO–MA to recover sums potentially available to it under the terms of this section."

Thus, the Department intended that Total Health Care would carry out the State's duty to provide medical care to low-income persons, while also possessing the State's right of subrogation granted by § 15–120. The amount of the capitation payment that the State would pay Total Health Care for each program recipient was determined on the assumption

---

**2.** Originally, the Department contracted with West Baltimore Community Health Care Corporation, which subsequently changed its name to Total Health Care, Inc. in 1989. As used in this opinion, "Total Health Care" refers to both Total Health Care and West Baltimore Community Health Care Corporation.

that Total Health Care would have the right to recover any amounts it paid for medical treatment from responsible third parties. *See* 8:4 Md. Register 355 (February 20, 1981).

## II.

With this general background in mind, we turn to the facts of this case. Georgette Roberts and her two minor children, Shaneira and Corina Deloatch, were enrolled with Total Health Care under the State's Medicaid program from 1987 through 1991. In 1987 Shaneira and Corina suffered lead poisoning and required significant medical care which Total Health Care could not provide at its facilities. Therefore, Total Health Care arranged for the two girls to receive treatment at the Kennedy Institute for Handicapped Children, for which Total Health Care paid $59,880.

In 1988, Shaneira and Corina sued their landlord for the injuries they suffered as a result of the lead poisoning. Upon learning of the suit in June 1991, Total Health Care sent a "lien letter" to the children's attorney asserting its "statutory subrogation lien and rights provided in § 15–120" as assigned to it by the State. This letter requested that the children's attorney forward a check for $59,880 out of any settlement or judgment received by the children, and stated that "any settlement entered into concerning the matter may be overturned if THC is not consulted or paid." Total Health Care sent a second letter asserting its "statutory lien under § 15–120" in July 1992. The children's civil suit was settled for $330,000 in October 1993, at which time Total Health Care made both an oral and a written demand for payment of $59,880 from the settlement proceeds. When payment was not forthcoming, Total Health Care brought this action in the Circuit Court for Baltimore City, naming both Georgette Roberts and her attorney, Saul E. Kerpelman, as defendants.[3]

───────

3. Kerpelman had placed $59,880 from the settlement proceeds in his escrow account pending resolution of Total Health Care's claim. As indicated in Part I, *supra,* § 15–120 imposes personal liability on an

In its complaint, Total Health Care claimed a right to payment of the $59,880 which it had expended for Shaneira and Corina's medical care based on a statutory subrogation claim under § 15–120 (as assigned to it by the Department), and, alternatively, based on principles of non-statutory equitable subrogation. Total Health Care filed a motion for summary judgment. In opposing the motion, Roberts and Kerpelman argued that § 15–120 violated their due process rights, that the State's rights under § 15–120 were not assignable to Total Health Care, and that Total Health Care had no right to equitable subrogation. After oral argument, the circuit court granted Total Health Care's motion for summary judgment.

Roberts and Kerpelman then appealed to the Court of Special Appeals, repeating their arguments that § 15–120 is unconstitutional under due process principles, that the § 15–120 subrogation right was not assignable to Total Health Care, and that Total Health Care had no right of equitable subrogation. The Court of Special Appeals rejected their arguments and affirmed. *Roberts v. Total Health Care, Inc.*, 109 Md. App. 635, 675 A.2d 995 (1996).

Roberts and Kerpelman then filed a petition for a writ of certiorari which this Court granted. *Roberts v. Total Health Care, Inc.*, 343 Md. 566, 683 A.2d 178 (1996).

### III.

The petitioners' primary argument is that § 15–120 violates principles of procedural due process because the statutory obligation to withhold funds constitutes a lien imposed without the opportunity for a prior hearing. We disagree.

### A.

██ Both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of

---

attorney for any amounts released to a client if they are later unrecoverable.

Rights [4] protect interests in life, liberty and property from deprivation or infringement by government without appropriate procedural safeguards. At "[t]he core of due process is the right to notice and a meaningful opportunity to be heard." *LaChance v. Erickson*, —— U.S. ——, ——, 118 S.Ct. 753, 756, 139 L.Ed.2d 695, 700 (1998). *See Blue Cross v. Franklin Sq. Hosp.*, 277 Md. 93, 101, 352 A.2d 798, 804 (1976), and cases there cited; *Accrocco v. Splawn*, 264 Md. 527, 534–535, 287 A.2d 275, 279–280 (1972).

Due process, however, is not a rigid concept. As this Court stated in *Department of Transportation v. Armacost*, 299 Md. 392, 416, 474 A.2d 191, 203 (1984), "[d]ue process does not require adherence to any particular procedure. On the contrary, due process is flexible and calls only for such procedural protections as the particular situation demands." Thus, in determining what process is due, the Court will "balanc[e] the private and government interests affected." 299 Md. at 416–420, 474 A.2d at 203–205. According to the Supreme Court (*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976)):

> "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

---

**4.** Article 24 of the Maryland Declaration of Rights states as follows:

"**Article 24. Due Process**

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

*See also United States v. James Daniel Good Real Property,*
510 U.S. 43, 53, 114 S.Ct. 492, 501, 126 L.Ed.2d 490, 503 (1993)
(discussing application of the balancing test to determine
whether predeprivation notice and hearing are required).

█ Before the protections of due process are implicated
requiring the Court to engage in this balancing test, however,
two threshold inquiries must be satisfied. As we stated in
*Golden Sands Club v. Waller,* 313 Md. 484, 488 n. 4, 545 A.2d
1332, 1334 n. 4 (1988):

> "[T]o invoke the protections of procedural due process in a
> property context, the party asserting unconstitutionality
> must show that (1) State action has been employed (2) to
> deprive that party of a substantial interest in property.
> *Tulsa Professional Collection Serv. v. Pope,* 485 U.S. [478,
> 485], 108 S.Ct. 1340, 1344–1345, 99 L.Ed.2d 565, 575 (1988);
> *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98
> S.Ct. 1554, 1560, 56 L.Ed.2d 30, 39 (1978); *Department of
> Transportation v. Armacost,* 299 Md. at 416, 474 A.2d at
> 203; *Pitsenberger v. Pitsenberger,* 287 Md. [20,] 27, 410
> A.2d [1052,] 1056 [ (1980) ]; L. Tribe, *American Constitu-
> tional Law* § 10–8 at 680 (2d. ed.1988)."

*See also, Barry Properties v. Fick Bros.,* 277 Md. 15, 22–23,
353 A.2d 222, 227–228 (1976). This Court summarized the
appropriate inquiry in *Riger v. L & B Ltd. Partnership,* 278
Md. 281, 288–289, 363 A.2d 481, 485–486 (1976):

> "In analyzing any contention that a state is depriving one of
> his property without due process of law, several issues are
> logically presented. There must be sufficient governmental
> involvement in the action complained of to constitute 'state'
> action.... In addition, the government action must result
> in a 'deprivation' of the complainant's interest.... More-
> over, the private interest involved must rise to a 'property'
> interest within the meaning of the Due Process Clause....
> Finally, if there is state action depriving one of a property
> interest, the pertinent inquiry then relates to the procedure
> which is constitutionally required under the circumstances,

as the requirements of procedural due process are flexible, involving a balancing of the various interests at stake...."

### B.

Consequently, Roberts and Kerpelman can prevail only if § 15–120 deprives them of a significant property interest. We conclude that it does not.

Kerpelman, as Roberts's attorney, obviously has no personal claim to the settlement proceeds themselves. Furthermore, his right to receive payment for the legal services which he performed is not affected by § 15–120. Legal fees are deducted from the total amount of the settlement prior to any distribution to satisfy the subrogation claim. *See* § 15–120(b)(1) (an amount sufficient to satisfy the subrogation claim should be held "after deducting applicable attorney fees and litigation costs"). Therefore, the fact that § 15–120 requires money to be held from the settlement proceeds does not affect any property interest of Kerpelman.

Also, there is no deprivation of a property interest of Roberts or the children resulting from the requirement that the money be held. As mentioned previously, upon accepting medical assistance, Roberts and the children were deemed to have assigned to the State "any rights to payment for medical care services from any third party who has the legal liability to make payments for those services . . . ." § 15–109(d). The effect of an assignment is to transfer all interests in the property from the assignor to the assignee. *See, e.g., Fifield Manor v. Finston,* 54 Cal.2d 632, 640, 7 Cal.Rptr. 377, 382, 354 P.2d 1073, 1078 (1960) (*en banc* ) (both assignment and subrogation "operate[ ] to transfer from one person to another a cause of action against a third"); *Bouchard v. People's Bank,* 219 Conn. 465, 473, 594 A.2d 1, 4–5 (1991) ("Succession by an assignee to exclusive ownership of all or part of the assignor's rights respecting the subject matter of the assignment, and a corresponding extinguishment of those rights in the assignor, is precisely the effect of a valid assignment"); *Vowers & Sons, Inc. v. Strasheim,* 248 Neb. 699, 704, 538 N.W.2d 756, 760

(1995) ("An assignment is a transfer vesting in the assignee all the assignor's rights in property which is the subject of the assignment"); *Achrem v. Expressway Plaza Ltd.*, 112 Nev. 737, 917 P.2d 447, 450 (1996) ("[W]hen a client assigns rights to the proceeds of a tort action to a creditor, those proceeds no longer belong to the client"); *Romero v. Earl*, 111 N.M. 789, 810 P.2d 808 (1991); *Leon v. Martinez*, 84 N.Y.2d 83, 88, 614 N.Y.S.2d 972, 974, 638 N.E.2d 511, 513 (1994) (to effect an assignment "it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned").

Therefore, when Roberts and the children asserted a right to recover for medical expenses, they were asserting a right which belonged to the State to the extent of any payments under the Medicaid program. To the extent that they recovered money in settlement for medical expenses that were paid under the Medicaid program, that recovery did not belong to them, but belonged to the State by virtue of the prior assignment.

A similar conclusion was reached recently by the New York Court of Appeals in a Medicaid recoupment context. *Cricchio v. Pennisi*, 90 N.Y.2d 296, 660 N.Y.S.2d 679, 683 N.E.2d 301 (1997). The question in that case was whether the Department of Social Services could make a claim for recoupment of Medicaid benefits against settlement proceeds despite the fact that "a Medicaid lien ordinarily may not be imposed against the property of any *individual* prior to his death...."[5] 90

---

5. New York's Social Services Law § 104–b authorizes the department of social services "to place a lien for public assistance on personal injury claims and suits against third parties to the extent of the expenditures made on the recipient's behalf." *Cricchio v. Pennisi*, 90 N.Y.2d 296, 306, 660 N.Y.S.2d 679, 682, 683 N.E.2d 301, 304 (1997); N.Y. Social Services Law § 104–b (Law. Co-op 1984). Additionally, however, under New York Social Services Law § 369(2)(a) (Law. Co-op 1984), "no lien may be imposed against the property of an individual prior to his or her death on account of medical assistance paid or to be paid on his or her behalf," with some exceptions. *See also* 42 U.S.C. §§ 1396a(a)(18) and 1396p(a)(1) (1994) ("no lien may be imposed

N.Y.2d at 306, 660 N.Y.S.2d at 682, 683 N.E.2d at 304. The court concluded that the recoupment claim could be made because, to the extent that the settlement proceeds were intended to compensate for medical care they were not the property of the recipient. 90 N.Y.2d at 306–307, 660 N.Y.S.2d at 682–683, 683 N.E.2d at 304–305. The court reasoned as follows (90 N.Y.2d at 307, 660 N.Y.S.2d at 682–683, 683 N.E.2d at 304–305):

> "As the Medicaid recipient's assignee . . ., [the department] obtains all of the rights that the recipient has as against the third party to recover for medical expenses, including the ability to immediately pursue those claims against the third party. Because the injured Medicaid recipient has assigned its recovery rights to [the department], and [the department] is subrogated to the rights of the beneficiary . . ., the settlement proceeds are resources of the third-party tortfeasor that are owed to [the department.] Accordingly, the lien on the settlement proceeds attaches to the property of the third party, and thus does not violate the statutory prohibition against imposing a lien against a beneficiary's property until after his or her death. . . . The flaw in plaintiffs' theory that the lien cannot be satisfied until the recipient's death is that it fails to appreciate this critical distinction between the assets of a responsible third party and assets belonging to the Medicaid recipient."

We agree with the analysis of the New York court. To the extent that the settlement proceeds received by Roberts and the children represent compensation for medical expenses paid under the medical assistance program, they are not Roberts's property. They are State property.[6] *See also, e.g., Payne v. State, Dept. of Human Resources,* 126 N.C.App. 672, 677, 486

against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan").

6. There is no dispute in this case as to the amount of the children's medical expenses. Kerpelman conceded at oral argument that the children's course of treatment cost $59,880, and that he had used that amount in the underlying tort suit and settlement negotiations.

S.E.2d 469, 471 (1997) (reaching a conclusion similar to that reached by the New York court); *Layman v. Woo,* 78 Ohio St.3d 485, 488, 678 N.E.2d 1217, 1219 (1997) (holding that department was "the real party in interest" with respect to recovery of medical expenses).

## C.

Even if we assume *arguendo* that a property interest held by Roberts or Kerpelman is involved, the obligation to hold sufficient funds from the settlement proceeds to satisfy the Department's subrogation claim would not violate due process principles.

Relying on this Court's opinion in *Barry Properties v. Fick Bros., supra,* 277 Md. 15, 353 A.2d 222, Kerpelman and Roberts argue that § 15–120 works a deprivation of their property interests requiring prior notice and hearing because it constitutes a statutory lien. In *Barry Properties,* the Court struck down portions of Maryland's mechanics' lien statute as violative of due process principles after reviewing four cases from the United States Supreme Court. *See North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). This Court held in *Barry Properties* that the imposition of a lien under the mechanics' lien statute, prior to notice and a hearing, constituted a deprivation of a significant property interest without due process. *Barry Properties v. Fick Bros., supra,* 277 Md. at 23–25, 353 A.2d at 227–228.

Under the mechanics' lien statute at issue in *Barry Properties,* "there [was] a 'subsisting lien' as soon as materials [were] supplied or work [was] performed, ... which constitut[ed] a cloud on the property owner's title.... [Thus,] he no longer [had] unfettered title [and] his equity [was] diminished to the extent of the lien." 277 Md. at 23–24, 353 A.2d at 228. *See also Connecticut v. Doehr,* 501 U.S. 1, 11, 111 S.Ct. 2105, 2113,

115 L.Ed.2d 1, 14 (1991) (prejudgment attachment of real property "clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause"); *North Georgia Finishing, Inc. v. Di–Chem, Inc., supra,* 419 U.S. at 606, 95 S.Ct. at 722, 42 L.Ed.2d at 757 ("a bank account, surely a form of property, was impounded and, absent a bond, put totally beyond use...."); *Fuentes v. Shevin, supra,* 407 U.S. at 69, 92 S.Ct. at 1988, 32 L.Ed.2d at 564 (prejudgment replevin statutes authorized "[t]he issuance of writs ordering state agents to seize a person's possession...."); *Sniadach v. Family Finance Corp., supra,* 395 U.S. at 338–339, 89 S.Ct. at 1821, 23 L.Ed.2d at 352 (under prejudgment garnishment "whereby ... wages are frozen ... the wage earner is deprived of his enjoyment of earned wages ...").

While the § 15–120 requirement that a portion of the settlement proceeds be held on behalf of the Department may prevent a program recipient from disposing of those proceeds, it is not as significant a deprivation of property as those presented in *Barry Properties* and the Supreme Court cases cited above. Under § 15–120, the settlement proceeds were not seized but were left in the possession of Kerpelman. Also, no lien existed, nor was any action taken by Total Health Care or the State beyond notifying Kerpelman of the subrogation claim.

In *United States v. James Daniel Good Real Property, supra,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490, there was a due process challenge to pre-hearing government seizure of a residence subject to forfeiture under 21 U.S.C. § 881(a)(7) as property used to commit or facilitate the commission of a federal drug offense. The Supreme Court upheld the challenge, holding that the government could not seize the property without affording the owner prior notice and hearing. *United States v. James Daniel Good Real Property, supra,* 510 U.S. at 62, 114 S.Ct. at 505, 126 L.Ed.2d at 508. In so holding, however, the Supreme Court specifically endorsed

various governmental means of preventing disposal of property prior to forfeiture judgment as less onerous alternatives to seizure, and indicated that no prior notice and hearing would be required by such action. One such action cited with approval by the Supreme Court was the filing of a notice of *lis pendens.* The Supreme Court stated that (510 U.S. at 58–59, 114 S.Ct. at 503–504, 126 L.Ed.2d at 506–507):

> "The Government's legitimate interests at the inception of forfeiture proceedings are to ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment. These legitimate interests can be secured without seizing the subject property.
>
> "Sale of the property can be prevented by filing a notice of *lis pendens* ... There is no reason to take the additional step of asserting control over the property without first affording notice and an adversary hearing."

*See also U.S. v. Real Prop. Known & Numbered as 429 S. Main Street,* 52 F.3d 1416, 1420 (6th Cir.1995); *U.S. v. 408 Peyton Rd., S.W., Atlanta, Ga.,* 112 F.3d 1106, 1110 n. 5 (11th Cir.1997).

Subsequently, the United States Court of Appeals for the Sixth Circuit was presented with a due process challenge to a state procedure providing for the filing of a lien notice against property subject to civil forfeiture prior to judgment. *Aronson v. City of Akron,* 116 F.3d 804 (6th Cir.1997). Relying on *United States v. James Daniel Good Real Property, supra,* the Court of Appeals held that the filing of the lien notice did not violate due process principles even if filed without prior notice and hearing. This was so because (*Aronson v. City of Akron, supra,* 116 F.3d at 811–812)

> "[t]he filing of a lien notice has the same practical effect as the filing of a *lis pendens* notice. * * *
>
> "In addition to impairing the owner's ability to sell his interest in the property, a *lis pendens* or corrupt activity lien may taint the owner's credit rating, may place an existing mortgage in technical default, may make it impossible to obtain a second mortgage, and may have other

adverse consequences. But under *Good's* evaluation of the *Mathews* factors, as our court recognized in *429 South Main Street*, this 'would not trigger the notice and hearing requirement.' *429 South Main Street*, 52 F.3d at 1421. The mere filing of an ordinary lien or *lis pendens* notice simply does not represent the sort of 'grievous loss'—*see Mathews*, 424 U.S. at 333, 96 S.Ct. at 901–02—that necessitates prior notice and an opportunity to be heard."

The procedure under § 15–120 does not constitute as great an intrusion as the lien discussed in *Aronson v. City of Akron*, *supra*, or the *lis pendens* discussed in *United States v. James Daniel Good Real Property, supra*. Under § 15–120, nothing is filed with a court and no lien attaches. Rather, a notice is sent to the recipient or her attorney informing them of the State's subrogation claim and the obligation to withhold sufficient funds to satisfy that claim.

### D.

Furthermore, the withholding requirement of § 15–120 is consistent with other State and Federal statutes involving government reimbursement and subrogation claims, as well as the common law of assignment. Roberts and Kerpelman mischaracterize § 15–120 when they state that "it makes the program recipient's lawyer the agent of the State for collection of the 'debt' upon penalty of personal liability if the 'debt' is not collected.... As long as the claim is made, the lawyer must hold back the money or face personal financial liability for it." (Petitioners' brief at 10). Attorneys are often held liable for funds distributed to clients without satisfying government subrogation or reimbursement rights. *See, e.g., Green v. United States Dept. of Labor*, 775 F.2d 964, 970 (8th Cir.1985) (holding an attorney jointly and severally liable to the government for funds received by the attorney and distributed to the client without first satisfying the government's reimbursement claim under the Federal Employees' Compensation Act); *United States v. Limbs*, 524 F.2d 799, 803 (9th Cir.1975) (stating that, under the Federal Employees' Compensation Act, an attorney "who receives settlement from a

third party tortfeasor . . . has an explicit duty to reimburse the federal government before paying his clients"); *U.S. v. Sosnowski*, 822 F.Supp. 570, 573 (W.D.Wis.1993) (noting that, under the Federal Medicare system, "[t]he government has an independent right of recovery against any entity, including a beneficiary or an attorney, which has received a third party payment. 42 C.F.R. § 411.24(g)"); *Matter of Barr*, 325 S.C. 240, 241, 481 S.E.2d 702, 702 (1997) (noting that, under South Carolina law, a lawyer may be held legally obligated to pay a Medicaid subrogation claim). *See also, e.g.*, Haw.Rev.Stat. § 346–37(e) and (i) (1993 Repl., 1997 Cum.Supp.) (providing for personal liability on part of attorney who fails to satisfy a government claim out of proceeds of a suit or settlement); Iowa Code § 249A.6(3) (1994, 1998 Cum.Supp.) (same); S.D. Codified Laws Ann. § 28–6–7.1 (1997 Supp.) (same); W. Va. Code § 9–5–11(b) (1998) (same).

Even absent a statute, courts generally hold that an attorney may be held liable for funds distributed to a client if they were received by the attorney with the knowledge that they had previously been assigned to a third party, as they were in the instant case. *See, e.g., Kaiser Foundation Health Plan, Inc. v. Aguiluz*, 47 Cal.App.4th 302, 305, 54 Cal.Rptr.2d 665, 666 (1996) ("an attorney on notice of a third party's contractual right to funds received on behalf of his client disburses those funds to his client at his own risk"); *Bonanza Motors, Inc. v. Webb*, 104 Idaho 234, 237, 657 P.2d 1102, 1105 (1983) (holding a law firm "liable to the creditor for funds relinquished to the client in violation of the assignment"); *Frontier Enterprises, Inc. v. Anchor Co. of Marblehead*, 404 Mass. 506, 511, 536 N.E.2d 352, 355 (1989) (stating that "[a]n attorney may be liable for paying funds to his or her client which are 'earmarked' for a third party and which 'belong' to the third party"); *General Exchange Ins. Corp. v. Driscoll*, 315 Mass. 360, 364–365, 52 N.E.2d 970, 973 (1944) (insurance company was subrogated to an insured's cause of action for property damage to the insured's car, and therefore had the "right to receive the proceeds" of any cause of action for that property damage; insured's attorney held liable to insurer for distribut-

ing settlement proceeds to the insured which were specifically marked as being for property damage).

Also, § 15–120 is consistent with a lawyer's ethical duties regarding the safekeeping of property belonging to the client and third parties. See Maryland Rules of Professional Conduct, Rule 1.15(b). The official comment to Rule 1.15 states as follows:

"Third parties, such as client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the client, and accordingly may refuse to surrender the property to the client."

Thus, § 15–120 does no more than to restate an already recognized principle of law that attorneys, with notice of an assignment of settlement proceeds by their client to a third party, are obligated to protect the interests of that third party and may be held liable for failure to do so.

 Moreover, any intrusion into the property interests of Roberts in the settlement proceeds is counterbalanced by strong governmental interests. The government has a strong interest in keeping its Medicaid program as efficient as possible and limited to its function of being the payor of last resort. The State's right of subrogation to claims against responsible third parties is an important mechanism in ensuring that the State will only pay for medical care as a last resort. *See Arkansas Dept. of Human Services v. Wilson,* 323 Ark. 151, 913 S.W.2d 783, 786 (1996), quoting *Arkansas Department of Human Services v. Walters,* 315 Ark. 204, 206, 866 S.W.2d 823, 823 (1993) (" 'Medicaid is to be the payor of last resort' "); *Shweiri v. Commonwealth,* 416 Mass. 385, 391, 622 N.E.2d 612, 616 (1993) (recognizing the "goal that Medicaid be the payor of last resort"); *Cricchio v. Pennisi, supra,* 90 N.Y.2d at 305, 660 N.Y.S.2d at 680, 683 N.E.2d at 303, (noting that "[r]ecoupment from responsible third parties is necessary to ensure that the Medicaid program remain the payor of last resort") (internal quotation marks omitted); *Wahl v. Morton County Social Services,* 574 N.W.2d 859, 864–865 (N.D.1998)

("The Medicaid program is intended to be the payor of last resort, with other available resources being used before medicaid pays for an individual's care"); *Matter of Estate of Higley*, 810 P.2d 436, 437 n. 2 (Utah App. 1991). The obligation to withhold funds from any settlement or judgment proceeds, in turn, helps to ensure that the State's right of subrogation will not be meaningless.

The State has a preexisting interest in the settlement proceeds derived from its right of subrogation as well as the earlier assignment of recovery rights by Roberts to the State. Under § 15–120, the State is seeking to recoup money it has already expended on a recipient's behalf. Requiring the State to give notice and a hearing prior to informing the recipient of her obligation to withhold funds from any settlement proceeds would severely undermine the State's ability to enforce its subrogation and assignment rights by giving the recipient an opportunity to dispose of the funds. It could endanger the viability of the Medicaid program.

Thus, the instant case presents a situation similar to that presented when the government utilizes summary procedures to collect taxes. The Supreme Court has "permitted the *ex parte* seizure of real property when the Government was collecting debts or revenue." *United States v. James Daniel Good Real Property, supra*, 510 U.S. at 59, 114 S.Ct. at 504, 126 L.Ed.2d at 507. According to Professor Tribe, "[t]he Supreme Court has consistently held that the federal and state governments may validly resort to summary procedures in order to assure effective collection of taxes by minimizing the taxpayer's opportunity to waste assets in anticipation of a collection attempt." L. Tribe, *American Constitutional Law,* § 10–14 at 722 n.18 (2d ed.1988). According to the Supreme Court, "[t]he prompt payment of taxes is always important to the public welfare. It may be vital to the existence of a government. The idea that every tax-payer is entitled to the delays of litigation is unreason." *Springer v. United States,* 102 U.S. 586, 594, 26 L.Ed. 253, 256 (1881). Like the collection of taxes, the recoupment of funds paid on behalf of a Medicaid recipient, who has the ability to repay them, is

important to the public welfare and the further health of the Medicaid system.

Based on all of the above considerations, we cannot conclude that § 15–120 violates principles of procedural due process by requiring an attorney or Medicaid recipient to withhold funds from any settlement proceeds from a responsible third party to satisfy the State's subrogation interests to the extent of any payments made on behalf of the recipient under the Medicaid program.

## IV.

Roberts and Kerpelman next attack the validity of Total Health Care's claim on the grounds that the State had no power to assign its subrogation rights under § 15–120. They rely on the lack of a common law right of subrogation under the circumstances and upon the absence in the statute of an express provision authorizing assignment of the subrogation right.

Although we have not ruled upon the issue, and find it unnecessary to do so in the present case, a majority of cases hold that a state does not enjoy a common law subrogation right or a right of recoupment for social services benefits provided to individuals.[7] *See, e.g., Ogdon v. Workmen's Comp. Appeals Bd.*, 11 Cal.3d 192, 199–200, 113 Cal.Rptr. 206, 210–211, 520 P.2d 1022, 1026–1027 (1974) (*en banc*) ("At common law in the absence of fraud in procuring relief a recipient of charity was under no obligation to repay the government agency disbursing such charity.... In the absence of statute therefore no liability rests upon the recipient of *public assistance* ... to reimburse the state or county for aid legitimately obtained and granted"); *Denver Dept. of Welfare v. Gomer*, 141 Colo. 65, 68, 346 P.2d 1016, 1017 (1959) (*en banc*) ("At common law, as a general rule, there was no obligation on the part of the [recipient] to reimburse public authorities for

---

7. This Court noted the issue in *Conaway v. Social Services Admin.*, 298 Md. 639, 643, 471 A.2d 1058, 1060 (1984), but rested its decision on statutory grounds.

support furnished"); *State ex rel. Iowa Dept. of Human Services v. Pierce,* 460 N.W.2d 467, 468 (Iowa 1990) ("When benefits have been properly paid there is no common law right provided to recoup them"); *Baker v. Sterling,* 39 N.Y.2d 397, 401, 384 N.Y.S.2d 128, 130–131, 348 N.E.2d 584, 587 (1976) ("At common law the recipient of public assistance was not obliged to repay, and no action could be brought to recover sums expended for his care and maintenance"); *Chester v. Drake,* 126 Vt. 472, 475, 236 A.2d 664, 667 (1967). *But see Com. v. Schuylkill County,* 361 Pa. 126, 129 n. 1, 62 A.2d 922, 923 n. 1 (1949) (recognizing a "common-law doctrine that there is an implied duty on the part of a recipient of public assistance to make reimbursement").

Upon its creation by statute, however, the State's subrogation right was freely assignable as a chose in action under the common law, and no statutory authority for the assignment was necessary. The State's § 15–120 subrogation right is a chose in action. *See Black's Law Dictionary* at 305 (4th Ed.1968) (defining chose in action as a "right to receive or recover a debt, demand, or damages on a cause of action"). As this Court stated in *Summers v. Freishtat,* 274 Md. 404, 407, 335 A.2d 89, 90–91 (1975), "the modern rule ... recogniz[es] that a chose in action, whether arising in tort or ex contractu, is generally assignable.... The only limitation, in the absence of a contrary statutory provision, is that the right of action be of a sort which would survive the death of the assignor and pass to his personal representatives...." *See also Medical Mutual v. Evans,* 330 Md. 1, 29, 622 A.2d 103, 116 (1993) ("a chose in action may be validly assigned"). Therefore, the State's § 15–120 subrogation right, as a chose in action, is generally assignable "in the absence of a contrary statutory provision," (*Summers v. Freishtat, supra,* 274 Md. at 407, 335 A.2d at 91), and this Court is unaware of any such contrary statutory provision. The fact that the subrogation right itself may not have existed at common law is immaterial.[8]

---

**8.** The General Assembly, in Ch. 500 of the Acts of 1995, Maryland Code (1982, 1994 Repl.Vol., 1997 Supp.), § 15–121.3 of the Health General

## V.

Finally, Roberts and Kerpelman argue that even if the § 15–120 subrogation right was assignable, Total Health Care can recover only what the State could have recovered, which is nothing. They base this argument on the language of § 15–120(a) which states that the State shall be subrogated "to the extent of any payments made by the Department on behalf of the program recipient that result from the occurrence...." They reason that, under § 15–120, the State only had a right to recover what the State itself paid as a result of the children's lead poisoning. Thus, their argument continues, the only right which the State could have assigned to Total Health Care was the right to recover what the State had paid as a result of the poisoning. Because the Department pays Total Health Care a monthly capitation payment for all of the children's health care, the Department paid nothing extra directly as a result of the lead poisoning. Therefore, according to Roberts and Kerpelman, Total Health Care was assigned a right to recover exactly that—nothing.

The above-summarized argument takes a far too formalistic approach to the statute. "In construing any statute, our principal aim is to effect the intent of the Legislature...." *County Commissioners v. Bell Atlantic,* 346 Md. 160, 169, 695 A.2d 171, 176 (1997). Furthermore, "[w]hen interpreting any statute, we must look to the entire statutory scheme, and not any one provision in isolation, to effect the statute's general policies and purposes." *County Commissioners v. Bell Atlantic, supra,* 346 Md. at 178, 695 A.2d at 180. It is clear that it would not effectuate the intent of the General Assembly, in light of the entire statutory scheme, to deny Total Health Care a recovery of the money it expended for the children's medical care on behalf of the Department.

The entire thrust of the medical assistance program is to provide the necessary amount of medical care to low-income

Article, has now expressly authorized the assignment of the State's right of subrogation.

persons while minimizing expenditures by the State. Thus, as discussed earlier, recipients are required to assign to the State any rights to recover damages for medical treatment from responsible third parties, § 15–109(d), and the State is subrogated to those claims, § 15–120. These two provisions help to minimize costs to the State by ensuring that the State will pay only when the program recipient has no other resources available. *See Arkansas Dept. of Human Services v. Wilson, supra,* 913 S.W.2d at 786; *Shweiri v. Commonwealth, supra,* 416 Mass. at 391, 622 N.E.2d at 616; *Cricchio v. Pennisi, supra,* 90 N.Y.2d at 304–306, 660 N.Y.S.2d at 680–681, 683 N.E.2d at 303–304; *Wahl v. Morton County Social Services, supra,* 574 N.W.2d at 864–865; *Matter of Estate of Higley, supra,* 810 P.2d at 437 n. 2.

Similarly, as discussed above, the State has reduced its costs by contracting with HMOs such as Total Health Care to provide medical care to program recipients for a monthly capitation fee. §§ 15–103(b)(2)(i) and 15–103(b)(18)(i). *See* Ch. 500 of the Acts of 1995, Preamble ("an innovative managed care Medical Assistance program [will] obtain the greatest amount of savings while assuring quality of care and access to services"). Obviously, when the costs incurred by the HMOs for the treatment of program recipients are lowered, the State directly benefits through lower capitation payments. Thus, allowing the HMOs to recover expenditures from responsible third parties is in accord with the entire statutory medical assistance scheme because it further reduces the amounts paid out by the State in the form of capitation payments, while ensuring medical care for low-income persons.

The reasonable interpretation of the statutory scheme is that the HMO is to be substituted for the State for purposes of § 15–120. The HMO is acting as an agent or administrator for the State in providing medical care to indigent persons and in collecting back any payments received for medical treatment from responsible third parties. This is an efficient system which maximizes the savings to the State by keeping capitation payments as low as possible. Furthermore, the

Department has consistently interpreted § 15–120 in this manner. As noted earlier, in its contract with Total Health Care the Department made clear that it intended for Total Health Care to have all of the same rights as the State in providing medical care to program recipients, stating that "[if] an enrollee [program recipient] under the terms of this contract has a cause of action against a person, the HMO–MA shall be subrogated to that cause of action to the extent of any payments made, or costs incurred, by the HMO–MA on behalf of the enrollee that result from the occurrence that gave rise to the cause of action."

This interpretation by the Department dates back at least to 1981. Prior to that time, the regulations under § 15–120 required HMOs to "determine whether the enrollee ha[d] third-party coverage, [to] seek recovery from that source for any medical services rendered, and [to] refund such payments, excluding Medicare, to the Department." COMAR 10.09.16.09.C (1977). In 1981, however, the regulations were amended, and the requirement that the HMO refund any recoveries to the Department was eliminated. *See* 8:4 Md. Register 355–356 (February 20, 1981). According to the Secretary of Health and Mental Hygiene, this change was made (*id.* at 355, emphasis added),

> "to achieve equity in payments to health maintenance organizations. *Medical assistance rates for these organizations are calculated on the assumption that collections from liable third parties will help defray the cost of services to Medical Assistance enrollees.* To require instead that these collections be refunded to the Department is to place an undue financial burden on the organizations."

This long-standing interpretation of § 15–120 by the administrators charged with its enforcement should be accorded considerable weight. *Lussier v. Maryland Racing Comm'n,* 343 Md. 681, 696–697, 684 A.2d 804, 811–812 (1996) (interpretation of a statute by the officials charged with administering the statute is afforded great weight, especially when accompanied by legislative acquiescence). *See, e.g., Md.*

*Classified Employees v. Governor,* 325 Md. 19, 33, 599 A.2d 91, 98, *cert. denied,* 502 U.S. 1090, 112 S.Ct. 1160, 117 L.Ed.2d 407 (1992); *Morris v. Prince George's County,* 319 Md. 597, 613, 573 A.2d 1346, 1354 (1990); *Board v. Harker,* 316 Md. 683, 698–699, 561 A.2d 219, 227 (1989); *McCullough v. Wittner,* 314 Md. 602, 612, 552 A.2d 881, 886 (1989); *Sinai Hosp. v. Dep't of Employment,* 309 Md. 28, 46, 522 A.2d 382, 391 (1987); *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307, 1315 (1986); *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 759, 501 A.2d 48, 63 (1985).

■■■ Therefore, we hold that Total Health Care had a subrogation right under § 15–120, as assigned to it by the Department, to collect the full amount it expended for the care and treatment of the children as a result of the lead poisoning.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONERS TO PAY COSTS.*