910 A.2d 514

**Fred S. SOMMER, et al.**

v.

**Lori Denise RHOADS.**

No. 1267, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Oct. 31, 2006.

394

Sandy D. Baron (Fred S. Sommer, Shulman, Rogers, Gandal, Pordy & Ecker, P.A. on the brief) Rockville, for appellant.

Matthew H. Simmons (Alan B. Neurick, Simmons & Associates, Chartered on the brief) Bethesda, for appellee.

Argued before ADKINS, KRAUSER, RODOWSKY and LAWRENCE F., JJ.

ADKINS, J.

In this case, we consider whether a statutory attorney's lien against a client's cause of action for work performed before the client's bankruptcy may survive that bankruptcy, even though the attorney did not give the notices required to assert the lien at the time the bankruptcy was filed. We shall hold that it may.

## FACTS AND LEGAL PROCEEDINGS

Appellants Fred S. Sommer, an attorney, and Shulman, Rogers, Gandal, Pordy & Ecker, P.A., his law firm (collectively referred to in the singular as Sommer), appeal the grant of summary judgment in favor of their former client, appellee

Lori Denise Rhoads. Appellants are attempting to collect the alleged balance due for attorney's fees incurred by Rhoads in connection with her employment discrimination lawsuit against her former employer.[1]

## The First Trial

In June 1994, Sommer filed a federal suit on behalf of Rhoads, alleging, *inter alia,* violations of the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA), arising from Rhoads's exposure to second-hand smoke in her workplace and her employer's allegedly retaliatory termination after she threatened to file an ADA discrimination claim. *See Rhoads v. F.D.I.C.,* 257 F.3d 373, 377–79 (4th Cir.2001), *cert. denied,* 535 U.S. 933, 122 S.Ct. 1309, 152 L.Ed.2d 219 (2002).

In February 1997, the district court granted summary judgment in favor of the employer on nine of Rhoads's ten claims. *See Rhoads v. FDIC,* 956 F.Supp. 1239 (D.Md.1997). A February 1998 jury trial of the remaining FMLA claim resulted in a defense verdict for the employer. Sommer filed various post-trial motions on Rhoads's behalf, none of which were successful.

## Rhoads's Bankruptcy

By that time, Rhoads claims, she had paid Sommer approximately $20,000 in attorney's fees and costs. On March 27, 1998, Rhoads filed for Chapter 7 bankruptcy, thereby staying the discrimination suit before the time for noting an appeal from the district court judgment expired. *See id.*

In her bankruptcy schedules, Rhoads listed a $190,000 debt to Sommer for "Legal services" as "an unsecured nonpriority claim." Rhoads also disclosed her "[c]ivil claim for damages," which she noted resulted in a "judgment for defendant 3/4/96, time for appeal has not expired." Sommer was identified as a

---

1. Rhoads was employed by Standard Federal Savings Association (SFSA). She sued the Federal Deposit Insurance Corporation (FDIC), as receiver for SFSA.

creditor and served notice. He did not file any response or other claim in the bankruptcy proceedings.

The bankruptcy trustee concluded that there was no value to the estate in pursuing the litigation through appeal, and ultimately that there was "no property available for distribution from the estate." He therefore released to Rhoads any interest she might have in the litigation. Rhoads's debts were unconditionally discharged on July 2, 1998.

### The First Appeal

That summer, Sommer discussed with Rhoads an appeal of the district court judgment. He wrote Rhoads that he was "willing to bring an appeal challenging the special verdict form used" to try the FMLA claim, and, depending on further research, "*might* also be willing to challenge the district court's summary judgment ruling" dismissing the ADA claim and limiting the period of back pay. Sommer stated that he was "not willing to raise any other issues or argument on appeal." In addition, Sommer proposed that Rhoads "would remain responsible for all unpaid fees and costs incurred to date and any future fees and costs, pursuant to the terms of our original fee agreement."

While they continued to negotiate, Sommer noted an appeal on Rhoads's behalf to the United States Court of Appeals for the Fourth Circuit, in order to preserve her right to challenge the district court judgment. During their discussions about such an appeal, Rhoads questioned, *inter alia,* whether a new retainer agreement would revive the debt that she believed had been discharged in bankruptcy. In response, Sommer took the position that, although he did "not intend to seek recovery from you of the unpaid attorney's fees and costs," he still had "a statutory lien for those fees and costs against any recovery you obtain in this case," and that this lien was not discharged in bankruptcy.

Disagreements between attorney and client continued. Sommer officially withdrew as Rhoads's attorney, effective August 29, 1998. One month later, on September 28, 1998,

Sommer asserted an attorney's lien for $159,729.74 (hereinafter, "Sommer's Lien Claim"), asserting the right to require the FDIC or the Court "to hold any money payable . . . to Ms. Rhoads relating to the action, proceeding, judgment, or award."

Rhoads proceeded with the appeal *pro se.* Although the Fourth Circuit affirmed the judgment against Rhoads on her FMLA claims, the appellate court held that the district court erred in granting summary judgment on Rhoads's retaliation claim under the ADA. *See Rhoads,* 257 F.3d at 394. The case was remanded for a new trial on that cause of action.[2] *See id.*

According to Rhoads, the ADA retaliation claim was what Sommer refused to pursue on appeal, whereas the FMLA arguments that Sommer advocated as grounds for appeal were rejected as contrary to the plain meaning of the statute. Not surprisingly, Sommer disputes Rhoads's contentions, asserting that she prevailed by relying on theories and evidence that he developed in discovery, pleadings, and trial.

### The Second Trial And Appeal

Rhoads continued to represent herself during the second trial. In December 2002, more than four years after Sommer withdrew as Rhoads's attorney, a federal jury found that the employer terminated Rhoads for asserting her rights under the ADA. The jury awarded Rhoads damages of approximately $120,000.

Rhoads then moved for an award of attorney's fees and costs. In support, she cited Sommer's "statutory lien in the amount of $159,729.74" and stated that she had "already paid Mr. Sommer a total of $20,398.52[.]" Rhoads asserted that during the five years of Sommer's representation, he billed "approximately 270 hours per year," which "was, in all regards, reasonable." She requested a total award of $175,744.99, which included fees and expenses for legal work

---

2. Shortly thereafter, on August 8, 2001, Rhoads filed suit against Sommer for legal malpractice. She prayed for "[r]ecovery of fees paid" to him and "dismissal" of his lien.

performed by her first attorney,[3] Sommer, and herself. In June 2003, Sommer moved to intervene for the purpose of being heard on the fee issue. The district court denied leave to intervene and also denied Rhoads's claim for fees and costs. *See Rhoads v. FDIC,* 286 F.Supp.2d 532, 545 (D.Md.2003), *aff'd,* 94 Fed.Appx. 187 (4th Cir.), *cert. denied,* 543 U.S. 927, 125 S.Ct. 331, 160 L.Ed.2d 226 (2004).

In its ruling, the federal court pointed out that Rhoads had asserted "that she owes nothing to Sommer as a result of the bankruptcy discharge." *See id.* at 543. In addition, "[i]t could be a windfall . . . to award her attorney's fees when she is simultaneously pursuing a judgment for attorney's fees in another forum." *Id.* The court suggested that, "even if [Sommer] were entitled to fees" for work performed prior to Rhoads's bankruptcy, "the amount would be very small" because "the prevailing party is not entitled to fees incurred in pursuing unsuccessful claims" and, "[o]f the approximately ten original claims, only one was ultimately successful." *See id.* at 542 n. 7. Finally, the federal court observed that, due to Sommer's withdrawal "before Rhoads prevailed at the Fourth Circuit and second trial," Sommer "would need to establish that [his] efforts, and not those of Rhoads or *amicus,* produced the final judgment in favor of Rhoads." *Id.* Rhoads's second appeal to the Fourth Circuit was unsuccessful.

## Sommer's Lien Action

In December 2004, Sommer filed in the Circuit Court for Montgomery County a verified complaint in this action, seeking a declaration "that the Attorney's Lien is valid and enforceable against the" judgment Rhoads obtained in the second trial, and asking the court to "enforce the Attorney's Lien against" "that judgment." The amount of Sommer's lien claim is $159,729.74, the same amount Sommer claimed when he withdrew six years earlier. Sommer also requested injunctive relief to ensure payment of his fees from any FDIC payment

---

**3.** Rhoads was briefly represented by another attorney before retaining Sommer.

made to satisfy the judgment in favor of Rhoads. In response, the circuit court ordered the FDIC to pay $40,000 of the $120,000 judgment into the court registry.

Rhoads moved to dismiss Sommer's lawsuit. While that motion was pending, Sommer moved for summary judgment. After briefing and oral argument, the Circuit Court for Montgomery County granted judgment in favor of Rhoads, treating her motion to dismiss as one for summary judgment. The court interpreted the Retainer Agreement between Sommer and Rhoads to be a waiver of Sommer's statutory lien rights. It held that Sommer agreed to forego his statutory lien rights by agreeing that, if his representation did not yield a judgment or settlement in Rhoads's favor, she would not be obligated to pay more than $500 per month toward the outstanding fee balance.

Sommer noted this appeal, raising six issues.[4] We address only the following issues:

---

4. Sommer presents the following questions in his brief:
 I. Whether the Circuit Court erred by interpreting the parties' Retainer Agreement to contain a "waiver" of Appellants' right to assert an attorney's lien.
 II. Whether Rhoads's Chapter 7 bankruptcy filing bars enforcement of Appellants' attorney's lien.
 III. Whether Appellants are entitled to enforcement of their attorney's lien where Rhoads admits that [ (i) ] the number of hours Appellants expended in representing her in the U.S. District Court Lawsuit was, in all regards, reasonable; (ii) the agreed-upon hourly rate was also reasonable; and (iii) all of the fees sought by the lien were incurred by Rhoads in the action in which the judgment was obtained.
 IV. Whether Appellants are required to establish that their services "produced" the judgment on which Appellants' attorney['s] lien is based.
 V. Whether, assuming that Appellants are required to establish that their services "produced" the judgment on which Appellants' attorney lien is based, the undisputed material facts establish as a matter of law that the judgment resulted from the work product and legal theories Appellants developed on Rhoads's behalf.
 VI. Whether the Circuit Court erred in denying Appellants' motion for summary judgment; request for injunctive relief; dissolving the temporary restraining order and in granting Rhoads's motion to dismiss, which the Circuit Court treated as one for summary judgment.

I. Under the terms of the Retainer Agreement and in light of Sommer's withdrawal as counsel after the unsuccessful first trial, did Sommer waive his right to a lien against the judgment Rhoads obtained in the second trial?

II. Did Rhoads's Chapter 7 bankruptcy discharge her debt to Sommer arising from the first unsuccessful trial?

We answer both questions no, vacate the judgment, and remand to the circuit court for resolution of the remaining issues that were not decided on summary judgment.

## DISCUSSION

### The Retainer Agreement

The Retainer Agreement (the Agreement) between Sommer and Rhoads provides for a hybrid attorney's fee, consisting of both a "Guaranteed Fee" accruing at $100 per hour and a "Contingent Premium" that potentially could raise the total compensation to 30 percent of Rhoads's recovery "[i]n the event that [she] obtains a judgment or settlement in her favor[.]" [5] The Guaranteed Fee is "payable regardless of whether a judgment or settlement is obtained in Client's favor." In no event could the Guaranteed Fee plus the Contingent Premium exceed 30 percent of the total recovery from settlement or judgment.

With respect to the payment of fees and costs, the Agreement provides:

### 1. *Monthly Payments*

Client will be billed monthly for all fees and costs incurred. Except for certain additional fee payments set forth below, Client will be required to pay within 30 days of the monthly bill:

---

**5.** The parties agree that the Contingent Premium is not at issue in this appeal.

- Either the balance of the fees outstanding or $500 toward the outstanding balance, whichever is less, **plus**

- all costs advanced by Attorney

In addition to the $500 monthly installment toward fees, Client will also be required to pay on a monthly basis for all hours worked in excess of 25 in a calendar month, **provided that** Attorney has obtained authorization for Client from such hours. . . .

### 2. *Payment Upon Receipt Of Judgment Or Settlement Proceeds Or Conclusion Of Case*

*Attorney will be entitled to payment of all fees and costs owed upon Client's receipt of the proceeds of a judgment or settlement upon the conclusion of any action brought by Attorney upon Client's behalf. If there is no judgment or settlement in favor of Client, Client will pay the outstanding balance to Attorney in $500 monthly installments.* (Italics added.)

### Lien Law

■ Under Maryland common law, attorneys do not have a charging lien. *See Tucker v. Dudley*, 223 Md. 467, 472, 164 A.2d 891 (1960). In 1985, the General Assembly established a statutory attorney's lien. *See* 1985 Md. Laws, ch. 723; *Consol. Constr. Servs., Inc. v. Simpson*, 372 Md. 434, 460–61, 813 A.2d 260 (2002). Md.Code (1989, 2004 Repl.Vol.), section 10–501 of the Business Occupations and Professions Article (BOP), provides in pertinent part:

(a) *In general.*—Subject to subsection (b) of this section, an attorney at law has a lien on:

(1) a cause of action or proceeding of a client of the attorney at law from the time the cause of action arises or the proceeding begins; and

(2) a settlement, judgment, or award that a client receives as a result of legal services that the attorney at law performs.

(b) *Limited fee agreement.*—A lien under this section attaches only if, and to the extent that, under a specific agreement between an attorney at law and a client, the client owes the attorney at law a fee or other compensation for legal services that produced the settlement, judgment, or award. . . .

(d) *Execution.*—An attorney at law may . . . bring an action for execution under the lien only in accordance with rules that the Court of Appeals adopts.

In turn, Md. Rule 2–652 specifies certain procedures that attorneys must follow to assert a lien under BOP section 10–501:

(b) **Statutory lien.** An attorney who has a lien under [BOP] § 10–501, may assert the lien by serving a written notice by certified mail or personal delivery upon the client and upon each person against whom the lien is to be enforced. The notice shall claim the lien, state the attorney's interest in the action, proceeding, settlement, judgment, or award, and inform the client or other person to hold any money payable or property passing to the client relating to the action, proceeding, settlement, judgment, or award.

(c) **Adjudication of rights and lien disputes.**

(1) When a circuit court action has been filed. If a lien asserted pursuant to this Rule relates to an action that has been filed in a circuit court of this State, on motion filed by the attorney, the attorney's client in the action, or any person who has received a notice pursuant to section (b) of this Rule, the court shall adjudicate the rights of the parties in relation to the lien, including the attorney's entitlement to a lien, any dispute as to the papers subject to a lien under section (a) of this Rule, and the amount of the attorney's claim.

(2) When no circuit court action has been filed. If a lien is asserted pursuant to this Rule and a related action has not been filed in a circuit court of this State, the attorney, the attorney's client, or any person who has received a

notice pursuant to section (b) of this Rule may file a complaint with a circuit court to adjudicate the rights of the parties in relation to the lien, including the attorney's entitlement to a lien, any dispute as to the papers subject to a lien under section (a) of this Rule, and the amount of the attorney's claim.

## I.

### Fee Agreement And Waiver Of Lien

■ The circuit court held that, under the terms of the Retainer Agreement, Sommer was not entitled to assert a statutory lien against the judgment Rhoads obtained in the second trial. In successfully arguing for that result, Rhoads relied on the provision in the Retainer Agreement stating that Sommer is "entitled to payment of all fees and costs owed upon client's receipt of the proceeds of a judgment ... **upon the conclusion of any action brought by the attorney upon client's behalf.**" (Emphasis added.) Rhoads interpreted "the conclusion of the action brought by the attorney on the client's behalf" to refer to judgment entered in favor of the FDIC after the first trial. Under the terms of the Retainer Agreement, Rhoads asserted, the balance due on the guaranteed fees was not "immediately due and payable" as it would have been if Rhoads had prevailed, but rather was due and payable only in $500 monthly installments.

Sommer countered that the meaning of the phrase "upon the conclusion of any action brought by the attorney" does not refer to the judgment in the first trial, but to the final conclusion of the entire lawsuit brought by Sommer on Rhoads's behalf, which is the $120,000 judgment in favor of Rhoads.

The circuit court agreed with Rhoads's construction of the Agreement:

[T]he Court finds that the phrase was reasonably understood by the parties to be limited to the initial trial conducted by Sommer. [Rhoads] ... points to numerous exhibits

which clearly evidence that Sommer interpreted the agreement as being limited to the initial trial. . . .

Since the Agreement covered representation through the initial trial only, then the test of whether the outcome was favorable or not is measured as of the conclusion of that proceeding. Here it was unfavorable. Judgment was entered for the employer. Therefore, Ms. Rhoads' only obligation under the Agreement was to pay the guaranteed fee at the rate of $500 per month. This has particular relevance for the issue of whether the attorney's lien survived the bankruptcy. . . . [G]enerally an attorney's lien is perfected upon the commencement of the representation. Therefore, such [perfected] liens typically would not be extinguished in bankruptcy. Here, however, **a plain reading of the fee agreement leads inevitably to the conclusion that [Sommer] has waived his right to assert such a lien in the event that a judgment in favor of the employer resulted from the initial trial.** . . . To grant the attorney a lien would be inconsistent with [Rhoads's] limited [payment] obligation. Accordingly, **[Sommer] waived his right to assert any attorney lien if judgment was entered in the employer's favor at the conclusion of the initial trial. For that reason, any obligation owed under this agreement following the initial trial was an unsecured personal obligation of [Rhoads] and was discharged in bankruptcy.** Therefore, [Rhoads] is entitled to judgment on [Sommer's] claim. (Emphasis added.)

■ We disagree with the motion court's conclusion that the Agreement reasonably can be interpreted to mean that Sommer waived his right to assert a lien if Rhoads lost at the first trial.[6] Rhoads has pointed to no language in the Agreement that says or implies this, and we have found none. The

---

6. Nor do we agree with Rhoads that Sommer's claim is a quasi-contract claim that would not meet the BOP section 10–501(b) requirement that there must be a "specific fee agreement." If Sommer were asserting the 30 percent contingency fee called for in the Agreement, then his claim might be based on quantum meruit because he did not complete the work necessary to obtain the full fee. *See Somuah v. Flachs,* 352 Md. 241, 258, 721 A.2d 680 (1998)(In a contingency fee context, "where

circuit court apparently relied on the clause in paragraph 2 of the Agreement calling for a $500 per month payment schedule, which applied only if there were no judgment or settlement in Rhoads's favor. The circuit court reasoned that a monthly payment schedule was inconsistent with the notion that the payment would be secured by any judgment, and from this inconsistency, inferred a waiver. We conclude this was error because there is no inconsistency between payment by install- ments over a period of time and holding security for those payments, *i.e.*, a lien against the cause of action. There is nothing in BOP section 10–501 or Rule 2–652 requiring that the proceeds of a cause of action subject to the lien must be immediately paid to the attorney holding the lien. Both subsections (1) and (2) of Rule 2–652(c) simply direct that "the court shall adjudicate the rights of the parties in relation to the lien[.]" The circuit court could easily direct, for example, that the appropriate part of the amount owed under the judgment or settlement be paid into court or an escrow account, and held as security or paid to the attorney in monthly increments.[7]

## II.

### Effect Of Bankruptcy Discharge

▉▉ Rhoads argues we should affirm because she was discharged in bankruptcy before the attorney's lien attached,

---

a client terminates an attorney-client relationship without any cause, or an attorney terminates the relationship with cause, the attorney may be entitled to *immediate quantum meruit recovery* from the client, *i.e.*, the reasonable value of the legal services rendered prior to the attorney's discharge"). Sommer, however, is claiming under the hourly fee terms of the Agreement, which is not a quasi-contract claim.

7. Sommer argues that Rhoads became obligated to pay the full hourly fee immediately, without the $500 per month payment schedule, be- cause Rhoads breached the contract by failing to make timely payments under the Agreement, and because she filed bankruptcy. We shall not address these arguments because they were not grounds on which the circuit court entered summary judgment. *See PaineWebber, Inc. v. East*, 363 Md. 408, 422, 768 A.2d 1029 (2001)("Maryland appellate courts, as a general rule, will consider only the grounds upon which the lower court relied in granting summary judgment").

and therefore she had no indebtedness to Sommer. She reasons that Sommer cannot have acquired a lien because BOP section 10–501 authorizes a lien only to the extent the client "owes ... compensation for services." Rhoads insists that "[i]t is textbook bankruptcy law that the automatic stay and subsequent discharge injunction bar efforts to collect pre-petition debts," citing *In re McNickle,* 274 B.R. 477, 480 (Bankr.S.D.Ohio 2002)("the majority rule, that strictly adheres to the Bankruptcy Code, holds that pre-petition legal services are subject to the discharge, and subsequent collection efforts violate the automatic stay and the discharge injunction"). *McNickle,* however, did not involve a claim for an attorney's lien, and there was no judgment or settlement the attorney claimed was produced by his services. The attorney simply sought compensation for legal work performed for the debtor in connection with the bankruptcy before the bankruptcy filing, and therefore he had the status of an ordinary unsecured creditor.

A claimant under an attorney's lien statute stands in a different position. As the circuit court recognized, generally, a lien survives bankruptcy discharge because the discharge "extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam*—while leaving intact another-namely, an action against the debtor *in rem.*" *Johnson v. Home State Bank,* 501 U.S. 78, 84, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991).[8] Our Court of Appeals has adopted this general rule. *See Hernandez v. Suburban Hosp. Ass'n,* 319 Md. 226, 236–37, 572 A.2d 144 (1990)(" 'We follow the majority of courts which hold that the Bankruptcy Code and its legislative history plainly establish the better rule of law-that valid liens that have not been disallowed or avoided survive the bankruptcy discharge of the underlying debt' ") (citation omitted). Although the effect of bankruptcy discharge on an attorney's right to a lien under BOP section 10–501 is a matter of first impression in this state, cases involving

---

8. *Johnson* involved a mortgage on real property.

attorney's liens in other jurisdictions have held that comparable attorney charging liens survived the bankruptcy.

Many courts interpreting attorney's liens have agreed that, although the lien does not attach until after the bankruptcy, once it does attach, it relates back and takes effect from the commencement of the attorney's services or the action. *See Hanna Paint Mfg. Co. v. Rodey, Dickason, Sloan, Akin & Robb,* 298 F.2d 371, 373 (10th Cir.1962)("The lien of an attorney for services rendered in an action relates back to, and takes effect from, the time of the commencement of the services[;] when it attaches to a judgment, it is superior to the claim of a creditor in whose favor execution has been levied, or to a subsequent attachment, garnishment, or trustee process"); *Matter of Pacific Far East Line, Inc.,* 654 F.2d 664, 669 (9th Cir.1981)("Under California law, the lien takes effect from the date it was created; upon the fund's production, the lien attaches to the specific asset"); *In the Matter of TLC of Lake Wales, Inc.,* 13 B.R. 593, 595 (Bankr.M.D.Fla.1981)("Although the charging lien does not attach until after judgment or recovery has been obtained, it relates back and takes effect from the date of the attorney's first commencement of services"); *In re Reinhardt,* 81 B.R. 565, 569 (Bankr.D.N.D.1987)(attorney's pre-bankruptcy charging lien related back to the date the services commenced, and despite failure to give notice, and without explicit relation-back language, lien survived bankruptcy discharge); *In re Miller,* 17 C.B.C. 28, 31 (E.D.Pa.1978)("at the time the bankruptcy was filed the attorneys were looking for payment of a fund to be created, and the fund has now come into existence. Although the charging lien attached after bankruptcy, it relates back and takes effect from the time the services were commenced . . . thus taking priority over the receiver"); *In re Kleer–Span Truss Co., Inc.,* 76 B.R. 30, 31 (Bankr.N.D.N.Y.1985)(relation back applied when statute provided: "From the commencement of the action, . . . the attorney who appears for a party has a lien upon his client's cause of action, claim, or counterclaim, which attaches to a verdict, [or] . . . decision, judgment or final order in his client's favor, and the proceeds thereof");

*In re E.C. Ernst, Inc.,* 4 B.R. 317, 320 (Bankr.S.D.N.Y. 1980)("The lien relates back and takes effect from the time the attorney's services were commenced").[9] These courts did not require that the statute or common law expressly use a term like "relates back." Rather they rested their decisions on their interpretation of the statute or common law as to the effective date of the lien. *See, e.g., In re Reinhardt,* 81 B.R. at 569 (noting lack of relation back language in North Dakota and Alaska attorney's lien statutes).

In *In re Albert,* 206 B.R. 636, 640 (Bankr.D.Mass.1997), the bankruptcy court applied Massachusetts law specifying that the lien dates "from the authorized commencement of an action." The court explained that the lien was inchoate at the time the lawsuit was filed, and "[t]he lien becomes choate when a judgment, decree, or other order is entered in the client's favor, and attaches to any proceeds derived therefrom." *Id.* at 639.

An earlier bankruptcy court decision, *In re Sea Catch, Inc.,* 36 B.R. 226, 233 (Bankr.D.Alaska 1983), explained the operation of the lien attachment and relation back:

> In those states which provide that an attorney's charging lien attaches to a judgment, verdict or order and that the effective date of the lien relates back to the commencement of the attorney's services, § 546(b) will protect the attorney's lien from being invalidated by the trustee's status as a hypothetical lien creditor as of the date of the filing of the petition. . . .
>
> "The general rule is that an attorney's charging lien relates back to and is effective from the time the attorney commences his services." (Citations omitted.)

The *Sea Catch* Court also clarified that there is a

---

**9.** *But see, e.g., In re Elec. Metal Prods., Inc.,* 916 F.2d 1502, 1505 (10th Cir.1990)("because [the attorney] did not file a notice of lien, it was not perfected against third parties and was therefore invalid against a trustee in bankruptcy as of the date of the bankruptcy filing"); *Hoffman & Schreiber v. Medina,* 224 B.R. 556, 560 (D.N.J.1998)(same).

distinction between the date an attorney's lien attaches and the date it becomes effective against a creditor assignee of the attorney's client. The lien cannot attach earlier than the entry of judgment, as there is nothing for the lien to attach to before that date.... Generally, however, once the lien attaches it relates back and is effective from the time the attorney begins his efforts on behalf of his client.

*Id.* at 233. Because of the relation back, the lien is not affected by initiation of bankruptcy proceedings. *See id.*

■ Thus, as *Sea Catch* instructs, the date of attachment of the lien is not the material issue in determining whether an attorney's lien will survive the client's bankruptcy. Rather, state law governing the effective date of the lien will determine whether the lien relates back to the commencement of the action (or the attorney's representation). *See, e.g., Albert,* 206 B.R. at 640 (state law determines whether pre-bankruptcy lien, once perfected, takes priority over interests which were perfected before the lien).

■ Rhoads does not agree that Sommer's lien relates back to a date preceding her bankruptcy. Relying on *Hoffman & Schreiber v. Medina,* 224 B.R. 556 (D.N.J.1998), Rhoads argues that Sommer's lien right could not survive her bankruptcy discharge because Sommer did not perfect his lien before the bankruptcy petition, having failed to "assert" the lien by serving the notice required by Md. Rule 2–652. In *Hoffman & Schreiber,* as Rhoads contends, the court held that the law firm failed to commence an action to determine and enforce its lien claim before the client filed her bankruptcy petition and therefore the claim was unperfected, unsecured, and discharged. *See id.* at 563.[10]

---

**10.** The New Jersey Supreme Court, however, later disapproved of the requirement that an attorney must "perfect" a lien for his fees by asserting it before judgment or settlement. Answering a certified question from the Third Circuit in *Musikoff v. Jay Parrino's The Mint, L.L.C.,* 172 N.J. 133, 796 A.2d 866, 868 (2002), the New Jersey court held that the state attorney's lien statute "does not require an attorney to file a petition to acknowledge and enforce an attorney's lien prior to

 We disagree with Rhoads's contention that *Hoffman & Schreiber* controls, because of how we construe BOP section 10–501. " '[T]he cardinal rule of statutory construction is to ascertain and effectuate legislative intention.' " *State v. Green,* 367 Md. 61, 81, 785 A.2d 1275 (2001) (citations omitted). When interpreting a statute, our starting point is the text of the statute. *See Adamson v. Corr. Med. Servs., Inc.,* 359 Md. 238, 251, 753 A.2d 501 (2000). "[I]f the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." *Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001).

There is nothing in the Maryland statute or rules that suggests that an attorney's right to a lien is lost because the attorney does not take steps to enforce the lien before the client files bankruptcy. Rather, BOP section 10–501 explicitly provides that the attorney "has a lien ... from the time the cause of action arises or the proceeding begins," without any notice requirements. Additionally, Md. Rule 2–652, titled "Enforcement of Attorney's Liens," says nothing to suggest that the BOP section 10–501 lien right is lost if the notice required by Rule 2–652(b) is not sent before a bankruptcy filing. Rather, this rule talks only about how to **"assert"** the lien. *See* Md. Rule 2–652(b)("An attorney who has a lien under Code, Business and Professions Article, § 10–501, **may assert the lien** by serving a written notice by certified mail or personal deliver upon the client and upon each person against whom the lien is to be enforced")(emphasis added). The rule

---

settlement or judgment in the matter that gives rise to the lien itself." It reasoned, *inter alia,* that the New Jersey

Act sought to codify and expand the common law charging lien "to protect attorneys who do not have actual possession of assets against clients who may not pay for services rendered." "The lien is rooted in equitable considerations, and its enforcement is within the equitable jurisdiction of the courts."

*Id.* at 871 (citations omitted).

says nothing about perfection of the lien or losing the lien for failing to serve the written notice within a particular time.

■■■ Our reading of the statute is also consistent with the purpose of section 10–501 and like statutes, which is " 'to protect the rights of an attorney unable to get possession against a client who seeks to avoid payment for services.' " *Vangrack, Axelson & Williamowsky, P.C. v. Est. of Abbasi,* 261 F.Supp.2d 352, 363 (D.Md.2003)(applying Maryland law)(quoting 2 Robert L. Rossi, *Attorney's Fees* § 12:13, at 12–23 & n. 10 (3d ed.2001)). *See also Sea Catch,* 36 B.R. at 234 (The object of attorney lien statutes is "to furnish security to attorneys for their efforts by giving them a lien upon the subject of the action"). In keeping with this purpose, and given the clear language of the statute, we think that in a contest between the attorney and the trustee, general creditors, or the bankrupt client herself, the requirement that notice be given in order to assert the lien is a condition for *enforcement* of the lien, but not for *continuation* of the *right* to a lien. In other words, failing to comply with the notice requirement does not interfere with the attorney's lien priority over general creditors of the client, including a trustee in bankruptcy, or cause the attorney to lose the lien in a dispute with the client herself.

In construing and applying the notice requirement in Rule 2–652, we find helpful the reasoning of the *Sea Catch* bankruptcy court, which discussed the notice provision in the Alaska attorney's lien statute:

[A] special agreement for compensation .... would have related back to be effective against not only an assignee (who takes subject to the contractual obligations of his assignor), but also against any third party who claims a right to the fund in question. **The notice provision is for the purpose of protecting a judgment or potential judgment debtor, not a third party creditor. It would be inequitable to give a third party creditor (or a trustee representing such creditors) a prior right over the value of the pre-petition services which contributed to the**

**creation of the fund,** especially in a case such as the instant one where the fund in question was awarded as compensation for the attorney's services.

*Sea Catch,* 36 B.R. at 234 (footnote omitted; emphasis added).

█ We think that the Court of Appeals, in adopting the requirement of Rule 2–652(b) that the attorney send notice to "each person against whom the lien is to be enforced," intended, *inter alia,* to protect the judgment debtor from innocently paying all the money to satisfy the judgment (that the attorney helped produce), to the client or his assignee.[11] Given this purpose, the failure to send notice to Rhoads's employer would not justify giving Rhoads's general creditors or her trustee in bankruptcy priority ahead of Sommer. Moreover, there is no

---

11. According to the June 18, 1993 meeting of the Rules Committee, Judge Alan M. Wilner, then Chair of the Committee, commented that "the purpose [of the notice] is to prevent the defendant from paying the client." The Rules Committee, in drafting the rule, also considered the potential problem when the judgment debtor (*e.g.,* the tortfeasor) might have to double pay a portion of the judgment by innocently paying the client before he knew of the attorney's lien. The Committee reviewed the analogous hospital lien statute as a starting point for formulation of an enforcement rule for the attorney's lien:

> Mr. Bowen has suggested, as a starting point, looking at the hospital lien statute, Code, Commercial Law Article, [section] 16–601 ff. The elements of that scheme are, essentially, a notice of lien filed with the clerk of court and provided to the tortfeasor and the insurer; the imposition of liability for the lien upon the third party payor for a period of one year; and the creation of a hospital lien docket in the clerk's office. Whether the creation of an analogous procedure might further poison the atmosphere between attorneys and their clients is an issue for the Subcommittee and the full Committee to consider.

Aug. 22, 1990 Memorandum From Una M. Perez, Esq., Reporter, to Members of the Judgments Subcommittee and the Attorneys Subcommittee of the Rules Committee. The Rules Committee files contain a copy of the hospital lien statute, Md.Code (1975, 2005 Repl.Vol.), section 16–603 of the Commercial Law Article, which provides, in pertinent part: "**After the filing and mailing of the notice of lien, if any person makes any payment to the patient,** his attorney, heirs, or personal representative as compensation for the injuries, **without paying the hospital the amount of the lien ...,** he is liable to the hospital for a period of one year from the date of making payment[.]" Evidently, the Committee's concern was with how to avoid injury to the judgment debtor or the attorney caused by the judgment debtor's ignorance of the attorney's lien.

showing that Rhoads's employer actually paid out the judgment to the client or someone else, in ignorance of Sommer's lien.

A second purpose of the notice requirement in Rule 2–652 is to satisfy the due process concerns recognized in *Barry Props., Inc. v. Fick Bros. Roofing Co.*, 277 Md. 15, 353 A.2d 222 (1976), by guaranteeing that the *client* knows of the attorney's intent to enforce the lien before the attorney is able to transfer a *possessory* interest to himself as a part of his enforcement action. *See* Mar. 10, 1995 Minutes of Court of Appeals Standing Committee on Rules of Practice and Procedure ("Section (b) has a constitutional requirement of notice by certified mail or personal delivery which is similar to the notice required in mechanics' liens"). As we discuss in Section III, *infra*, Rhoads suffered no impairment of her due process rights from Sommer's failure to give notice of his lien before she filed bankruptcy, because any loss or injury she suffered from the existence of the lien before she received notice was not sufficiently severe or grievous to violate such rights.

### Sommer's Failure To File Claim In Bankruptcy

Rhoads also insists that Sommer cannot now claim an attorney's lien because he failed to file any claim for such lien in Rhoads's bankruptcy. Sommer, however, correctly points out that the trustee in Rhoads's bankruptcy abandoned the cause of action, and thus never initiated an adversary proceeding to avoid the lien pursuant to 11 U.S.C. § 545(2).[12] Sommer is also right that, as a result of this abandonment, he was not required to file any proof of claim in the bankruptcy estate. *See In Re Marriage of Berkland*, 762 P.2d 779, 783

---

12. Title 11 of the United States Code, section 546(b) provides that the trustee's avoidance powers

are generally subject to any law that permits perfection of an interest in property to relate back and be effective against an entity that acquires rights in the property before the date of perfection ... [A] [l]aw [f]irm may enforce its attorney's lien in the judgment proceeds with priority over the trustee to the same degree its lien would have been effective as against a judicial lien creditor.

*In re Reinhardt*, 81 B.R. 565, 568 (Bankr.D.N.D.1987).

(Colo.Ct.App.1988). "The effect of abandonment by a trustee is to divest the bankruptcy estate of control over the abandoned property and revest title in the debtor. In doing so, the property becomes part of the debtor's non-bankruptcy estate, just as if no bankruptcy occurred." *In re Moody,* 277 B.R. 858, 861 (Bankr.S.D.Ga.2001).

### *In Personam v. In Rem*

Pursuing a different line of attack, Rhoads contends that Sommer's attorney's lien rights are conditioned on the viability, **after** bankruptcy, of his *in personam* cause of action against Rhoads. We do not agree. An attorney's lien under B.O.P section 10–501(b) is an action *in rem.* Although section 10–501(b) recognizes the lien only to the extent that, "under a specific agreement between an attorney at law and a client, the client owes the attorney at law a fee or other compensation for legal services that produced the settlement, judgment, or award[,]" this requirement does not change the *in rem* nature of the claim. There is nothing in the language of section 10–501 to suggest that a lien, which was to be effective "from the time the cause of action arises or the proceeding begins," is intended by the legislature to be invalid if the client filed for bankruptcy before the attorney sought to enforce the lien. To hold otherwise would undermine the remedial purpose of the statutory attorney's lien, which is to protect the attorney who helped produce a judgment against the client's attempts to avoid payment. *See Vangrack, Axelson & Williamowsky,* 261 F.Supp.2d at 363. *See also Reinhardt,* 81 B.R. at 568–69 (" '[A]ttorney lien statutes are to be regarded as remedial and should be liberally construed in aid of the object sought by the legislature, which is to furnish security for attorneys for their efforts by giving them a lien upon the subject of the action' ") (citation omitted); *Falconer v. Adams,* 20 P.3d 583, 586 n. 21 (Alaska 2001)(same).

### Legislative History Of BOP Section 10– 501 Regarding Priority Of Lien

"[C]ourts may consider the context in which a statute appears, including related statutes and legislative history,"

*Ridge Heating, Air Conditioning & Plumbing, Inc. v. Brennen,* 366 Md. 336, 350–51, 783 A.2d 691 (2001), and we have done so here. The purpose statement of the Senate bill proposing what is now BOP section 10–501 says: [13]

> For the purpose of providing that an attorney has a lien on certain actions of the attorney's client; providing that an attorney's lien extends to attorney's fees and compensation specially agreed on ~~or to the reasonable value of the attorney's services~~ under certain circumstances; providing for the priority of an attorney's lien, *with exceptions;* and generally providing for an attorney's lien on certain actions of the attorney's client and on certain judgments entered in favor of the attorney's client.

*See* Senate Bill No.1985–36. The exceptions contained in the bill were those in the current statute: "(1) A prior lien based on salaries or wages due to employees for work which is related to or a part of the award, order, decree or judgment; or (2) A lien against the client for state taxes due."

This legislative history suggests that the General Assembly intended that other creditors would *not* be able to obtain priority over the attorney's charging lien, except those falling within the specified exceptions. To interpret the statute to mean that an attorney's lien rights were lost simply because the client filed bankruptcy before the attorney gave the requisite notice to the client under Rule 2–652 would be contrary to the legislative intent that the lien have priority over all but specified creditors.

 In sum, under BOP section 10–501, which accords an attorney "a lien on . . . an action or proceeding of a client of the attorney at law from the time the action or proceeding begins," Sommer had a lien or a right to a lien [14] on Rhoads's

---

13. The stricken language was included in earlier bills, but deleted from the bill before passage. The underlined language was not included in earlier bills, and was added to the text of the bill before passage.

14. It is not important for our purposes whether Sommer actually had the lien, in the sense that the lien had attached, or whether he had a

cause of action, which, subject to a later determination of whether Sommers "produced the judgment," [15] BOP section 10–501(b), was effective from the "time the cause of action [arose] or the proceeding beg[an]" against other creditors except those named in subsection (b) of section 10–501.

### *Barry Properties* And Procedural Due Process

██ As part of her response to Sommer's lien survival theory, Rhoads argues that "were section 10–501 given the construction and effect Appellants need to prevail . . ., it would be manifestly unconstitutional." Relying on *Barry Props., Inc. v. Fick Bros. Roofing Co.*, 277 Md. 15, 33, 353 A.2d 222 (1976), she asserts that in Maryland, "a statute cannot create a lien 'without notice and opportunity for a prior hearing,' for a statute that authorizes a lien without these safeguards 'deprives the owner of his property without procedural due process.' "

In *Barry Properties,* our Court of Appeals declared the mechanic's lien statute to be unconstitutional in its then existing form, because it allowed prejudgment seizures of a debtor's property "without notice or a prior hearing or other safeguards[.]" *See id.* at 33–34, 353 A.2d 222. Rhoads argues that BOP section 10–501 is similarly flawed, and that despite the language saying that an attorney "has a lien . . . from the time the cause of action arises or the proceeding begins," no

---

right to a lien. As discussed earlier, what is material is whether state law provided that the lien is intended to be effective as of a time preceding the bankruptcy.

**15.** BOP section 10–501(b) requires that, in order for a lien to attach, the legal services must "produc[e] the . . . judgment[.]" Although the motion court interpreted the parties' Agreement to mean that Sommer waived his lien right in the event there was no favorable judgment for Rhoads at the end of the initial trial, it did not address the statutory requirement that the legal services must produce the judgment. Because it did not reach this question in granting summary judgment, we will not address it in this appeal. *See PaineWebber,* 363 Md. at 422, 768 A.2d 1029. Nor do we address Sommer's argument that Rhoads is judicially estopped from certain arguments because of representations she made in the federal district court with respect to Sommer's fees. *See id.*

lien could constitutionally exist at the time Rhoads filed bankruptcy. Because the lien could not exist at the time Rhoads filed for bankruptcy, Rhoads argues, it cannot be a lien entitled to survive bankruptcy.

Sommer counters that Rhoads suffered no impairment of a substantial interest in property, a necessary ingredient for a violation of due process claim under the principles explained in *Barry Properties*. We agree with Sommer that the difference between the harm suffered by Barry Properties materially differs from that allegedly suffered by Rhoads.

In *Barry Properties*,

"Fick's lien kept Barry from being paid the balance of its construction mortgage (the construction lender withheld payment pending resolution of this and other mechanics' lien claims) and prevented Barry from either closing a permanent mortgage or obtaining a second mortgage on the property's equity."

*Id.* at 227. These consequences all occurred before there had been any judicial review of the lien petitioner's claim. "[T]o invoke the protections of procedural due process in a property context, the party asserting unconstitutionality must show that (1) State action has been employed (2) to deprive that party of a **substantial interest** in property." *Golden Sands Club Cond., Inc. v. Waller,* 313 Md. 484, 488 n. 4, 545 A.2d 1332 (1988)(emphasis added). In some contexts, whether an interest is "substantial" has turned on a determination of whether it is a possessory interest. *See Lucky Ned Pepper's Ltd. v. Columbia Park & Recreation Ass'n,* 64 Md.App. 222, 235–36, 494 A.2d 947 (1985).

In *Lucky Ned Pepper's,* this Court examined whether procedural due process was violated by a statutory requirement that a tenant who prayed a jury trial, in defending his landlord's suit to eject him for failure to pay rent, must place all rent payments becoming due during the litigation into an escrow account. Writing for the court, Judge Alpert started his analysis by reviewing the standard set forth by the Court

of Appeals in *Dep't of Transportation, M.V.A. v. Armacost,*
299 Md. 392, 416–17, 474 A.2d 191 (1984):

> Once deprivation of a property interest is demonstrated, the
> court must ascertain what procedures are constitutionally
> required before an individual may be deprived of a protect-
> ed property interest.... [D]ue process is flexible and calls
> only for such procedural protections as the particular situa-
> tion demands.... Therefore, determination of what is re-
> quired must be made by balancing the private and govern-
> ment interests affected.... [T]he Supreme Court [has] set
> forth the appropriate factors: "... [I]dentification of the
> specific dictates of due process generally requires consider-
> ation of three distinct factors: first, the private interest that
> will be affected by the official action; second, the risk of an
> erroneous deprivation of such interest through the proce-
> dures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Govern-
> ment's interest, including the function involved and the
> fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail."

*Id.* at 416–17, 474 A.2d 191 (quoting *Mathews v. Eldridge,* 424
U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976)).

We considered *Barry Properties* and Supreme Court cases
concerning prejudgment seizures of personalty, and concluded
that the deprivation must be of a possessory interest in
personalty:

> Our courts have repeatedly looked to the Fourteenth
> Amendment for guidance in this area. *See Barry Proper-
> ties, Inc. v. Fick Bros. Roofing Co.,* 277 Md. 15, 22, 353 A.2d
> 222 (1976). To this end, we believe that Supreme Court
> cases concerning the constitutionality of prejudgment sei-
> zures are particularly instructive.

> The Supreme Court has generally held, with some excep-
> tions and limitations, that due process requires "an opportu-
> nity for an adversary type hearing before a person can be
> even *temporarily* deprived of any **possessory** interest in
> personalty." *Barry Properties,* 277 Md. at 26, 353 A.2d 222

(citing *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)).

*Id.* at 236–37, 494 A.2d 947 (bold added).

In further demonstrating that interference with a possessory interest was key to a successful procedural due process challenge on this basis, we examined a Supreme Court case involving pre-judgment sequestration of personalty pursuant to a vendor's lien, which is a creditor's remedy allowing the taking of the debtor's possessory [16] interest in personalty without a prior hearing:

> One such limitation upon the necessity for a pre-forfeiture hearing was addressed by the Supreme Court in *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). In *Mitchell* the Court addressed the constitutionality of a Louisiana statute which provided for the **sequestration of personal property,** pending the outcome of a suit for accrued payments on the property. Under the statute, a seller, who had a vendor's lien on the goods sold, would request a writ for sequestration of the goods and submit an affidavit setting forth specific facts giving rise to the claim, its nature and the amount thereof. A judge would then issue the writ if a clear showing had been made and the "creditors seeking the writ ha[d] filed a sufficient bond to protect the [debtor] against all damages in the event the sequestration is shown to have been improvident." *Id.* at 606, 94 S.Ct. at 1899 (footnotes omitted). Although the Louisiana statute provided no pre-sequestration hearing, the statute did entitle the debtor "immediately to seek dissolution of the writ, which must be ordered unless the creditor 'proves the grounds upon which the writ was issued,' the existence of the debt, lien, and delinquency, failing which the court may order return of the property

---

**16.** Sequestration is the "process by which property is **removed from the possessor** pending the outcome of a dispute in which two or more parties contend for it." *Black's Law Dictionary* 1397 (8th ed.2004)(emphasis added).

and assess damages in favor of the debtor, including attorney's fees." *Id.*

*Id.* at 237–38, 494 A.2d 947 (emphasis added).

We explained that the Supreme Court considered a hearing on the merits of the dispute either before the sequestration or shortly after, to be imperative:

> The Court held this statute constitutional. In so doing the Court observed that the statute was aimed at protecting the dual interests of the creditor and the debtor in the property to be seized. It noted that "[t]he danger of destruction cannot be guarded against if notice and a hearing before seizure are supplied." *Id.* at 609, 94 S.Ct. at 1901. Nonetheless, . . . "the debtor may immediately have a full hearing on the matter of possession following the execution of the writ, thus cutting to a bare minimum the time of creditor-or-court-supervised possession." *Id.*

This final provision was significant in upholding the constitutionality of the Louisiana statute. For example, in *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) the Supreme Court declared unconstitutional prejudgment replevin statutes of Florida and Pennsylvania. The statutes provided for the seizure upon the issuance of a writ. The writ was issued by a court clerk upon the application of anyone asserting an interest in the property to be replevied and the posting of a bond. **Neither statute provided for notice or a hearing prior to or shortly after the seizure.** Similarly, in *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) the Court struck down, as unconstitutional, a Wisconsin statute which permitted the prejudgment garnishment of wages. The statute allowed a creditor to freeze the wages of an alleged debtor without any form of notice or hearing prior to the garnishment. The statute was also unclear as to whether the alleged debtor had any **immediate remedy** by virtue of a post-garnishment hearing.

*Id.* at 237–38, 494 A.2d 947 (emphasis added). We glean from *Mitchell* and the other Supreme Court cases discussed above,

that the dual interests of the creditor and the debtor should be considered, but where the debtor is deprived of a possessory interest, there must be an opportunity for a hearing, either before or *immediately* after the seizure of the personalty.

In *Lucky Ned Pepper's,* we concluded that the rent escrow requirement was constitutional because the tenant had a sufficient right to a hearing before he risked **loss of possession** of the tenancy or his money, but not earlier:

> [B]ecause some sort of hearing is necessary, the statute, to the extent that it provides for the escrowing of accruing rents, must provide at least the opportunity for a hearing in order to be constitutionally acceptable. We believe that it does. Eliminating the unconstitutional portions, subsection (a) of the statute provides for a district court order requiring the payment of future (accruing) rents into escrow. The statute's only sanction for a tenant's failure to make the escrow payment appears in subsection (c) and must be invoked by a landlord who moves for judgment.

It is apparent that subsection (c) does not expressly provide for a hearing. We believe, however, that this subsection when read in connection with Maryland Rule 2–311(f), which prohibits "a decision dispositive of a claim or defense without a hearing", provides a tenant with a sufficient opportunity for a hearing.

If a tenant disputes the district court's escrow order, the tenant may elect not to comply with it. There is no automatic, self-executing sanction for such noncompliance; **the tenant becomes directly at risk only when the landlord moves for judgment. Upon such a motion, however, the tenant may request a hearing in order to dispute the validity or terms of the district court's escrow order or raise any other defense to his alleged noncompliance.** At that hearing the landlord must show that the escrow order is valid and that the tenant, without legal justification, has failed to comply with it. If the landlord fails to make

such a showing the circuit court must deny the motion for judgment and hold the case for trial by jury.

*Id.* at 238–39, 494 A.2d 947 (emphasis added).

Thus, in *Lucky Ned Pepper's,* we evaluated the tenant's procedural due process claim by focusing on the tenant's actual risk of losing his money or his tenancy before a hearing was held, a concept that is also useful here. Sommer's attorney's lien (or right to a lien), which existed from "the time the cause of action [arose] or the proceeding beg[an]," posed no actual risk to Rhoads because, if Rhoads disputed the lien, Sommer could do nothing to enforce the lien without a hearing. Also, public notice of Sommer's lien did not occur until **after** he gave notice to Rhoads and the judgment debtor pursuant to Md. Rule 2–652. When Rhoads raised a dispute about the lien in circuit court, the court was required to adjudicate the dispute before any money changed hands, a process that accorded Rhoads procedural due process.

More recently, in *Roberts v. Total Health Care, Inc.,* 349 Md. 499, 514–17, 709 A.2d 142 (1998), the Court of Appeals considered *Barry Properties* and the Supreme Court cases it relied on in concluding that a child participating in a medical assistance program was not deprived of procedural due process by the statutory and equitable subrogation rights of the State to the proceeds of a tort settlement in a lead poisoning case.[17] Although the State's subrogation right addressed in *Roberts* was not a lien like an attorney's BOP § 10–501 lien,[18]

---

**17.** Under the predecessor to current Md.Code (1982, 2005 Repl.Vol., 2005 Cum.Supp.), section 15–109(d) of the Health–General Article (HG), the injured children, as a condition of eligibility for medical assistance, were "deemed to have assigned to the Secretary of Health and Mental Hygiene or the Secretary's designee any rights to payment for medical care services" due from the defendant in a lead poisoning suit.

**18.** The relevant portion of the statute governing subrogation claims, HG section 120(c), provides:

(1) Any Program recipient or attorney, guardian, or personal representative of a Program recipient who receives money in settlement of or under a judgment or award in a cause of action in which the

the children argued that "the statutory obligation to withhold funds constitutes a lien imposed without the opportunity for a prior hearing." *Id.* at 508, 709 A.2d 142. The court rejected this argument, providing a useful analysis of procedural due process in the establishment of liens, which distinguished the state's subrogation rights from the mechanic's lien statute found unconstitutional in *Barry Properties:*

> [T]he obligation to hold sufficient funds from the settlement proceeds to satisfy the Department's subrogation claim [does] not violate due process principles....
>
> Under the mechanics' lien statute at issue in *Barry Properties,* "there [was] a 'subsisting lien' as soon as materials [were] supplied or work [was] performed, ... which constitut[ed] a cloud on the property owner's title.... [Thus,] **he no longer [had] unfettered title [and] his equity [was] diminished to the extent of the lien.**" 277 Md. at 23–24, 353 A.2d 222. *See also Connecticut v. Doehr,* 501 U.S. 1, 11, 111 S.Ct. 2105, 2113, 115 L.Ed.2d 1 (1991) **(prejudgment attachment of real property "clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause");** *North Georgia Finishing, Inc. v. Di–Chem, Inc., supra,* 419 U.S. at 606, 95 S.Ct. at 722 ("a bank account, surely a form of property, was impounded and, absent a bond, put totally beyond use...."); *Fuentes v. Shevin, supra,* 407 U.S. at 69, 92 S.Ct. at 1988 (prejudgment replevin statutes authorized "[t]he issuance of writs ordering state agents to seize a person's possession");

---

Department has a subrogation claim shall, after receiving written notice of the subrogation claim, hold that money, for the benefit of the Department, to the extent required for the subrogation claim, after deducting applicable attorney fees and litigation costs.

(2) A person who, after written notice of a subrogation claim and possible liability under this paragraph, disposes of the money, without the written approval of the Department, is liable to the Department for any amount that, because of the disposition, is not recoverable by the Department.

*Sniadach v. Family Finance Corp., supra,* 395 U.S. at 338–339, 89 S.Ct. at 1821 (under prejudgment garnishment "whereby ... wages are frozen ... the wage earner is deprived of his enjoyment of earned wages ...").

*Id.* at 514–15, 709 A.2d 142 (emphasis added). We glean from this discussion that the question of whether due process has been violated turns on the extent to which the lien **actually interferes** with the debtor's property rights.

The significance that governmental seizure of control plays in finding a procedure due process violation was highlighted, as the *Roberts* Court continued:

> In *United States v. James Daniel Good Real Property, supra,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490, there was a due process challenge to pre-hearing government seizure of a residence subject to forfeiture under 21 U.S.C. § 881(a)(7) as property used to commit or facilitate the commission of a federal drug offense. The Supreme Court upheld the challenge, holding that the government could not seize the property without affording the owner prior notice and hearing. *United States v. James Daniel Good Real Property, supra,* 510 U.S. at 62, 114 S.Ct. at 505. **In so holding, however, the Supreme Court specifically endorsed various governmental means of preventing disposal of property prior to forfeiture judgment as less onerous alternatives to seizure, and indicated that no prior notice and hearing would be required by such action. One such action cited with approval by the Supreme Court was the filing of a notice of *lis pendens.*** The Supreme Court stated that (510 U.S. at 58–59, 114 S.Ct. at 503–504):
>
> > "The Government's legitimate interests at the inception of forfeiture proceedings are to **ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment." These legitimate interests can be secured without seizing the subject property.** "Sale of the property can be prevented by filing a notice of lis pendens ... There is no reason to take the additional step of **asserting control over the**

property without first affording notice and an adversary hearing."

*Id.* at 515–16, 709 A.2d 142.

The Court of Appeals in *Roberts* considered the filing of a lien notice no more onerous than a *lis pendens* notice:

Subsequently, the United States Court of Appeals for the Sixth Circuit was presented with a due process challenge to a state procedure providing for the filing of a lien notice against property subject to civil forfeiture prior to judgment. *Aronson v. City of Akron*, 116 F.3d 804 (6th Cir. 1997). Relying on *United States v. James Daniel Good Real Property, supra*, the Court of Appeals held that the filing of the lien notice did not violate due process principles even if filed without prior notice and hearing. This was so because (*Aronson v. City of Akron, supra*, 116 F.3d at 811–812)

"[t]he filing of a lien notice has the same practical effect as the filing of a *lis pendens* notice. * * *

"In addition to impairing the owner's ability to sell his interest in the property, a *lis pendens* or corrupt activity lien may taint the owner's credit rating, may place an existing mortgage in technical default, may make it impossible to obtain a second mortgage, and may have other adverse consequences. But under *Good's* evaluation of the *Mathews* factors, as our court recognized in *429 South Main Street*, this 'would not trigger the notice and hearing requirement.' *429 South Main Street*, 52 F.3d at 1421. **The mere filing of an ordinary lien or *lis pendens* notice simply does not represent the sort of 'grievous loss'**—*see Mathews*, 424 U.S. at 333, 96 S.Ct. at 901–02–that necessitates prior notice and an opportunity to be heard."

*Id.* at 516–17, 709 A.2d 142 (emphasis added).

We conclude that an attorney's lien is no more onerous than a *lis pendens* notice. An attorney's lien under BOP section 10–501(d) does not result in the sort of "grievous loss" that necessitates an opportunity to be heard before it is effective in

the sense that it will be considered. An attorney's lien will not typically affect the client's credit rating, or place the client in default under a loan. Indeed, a creditor or potential creditor of the client would reasonably expect that an attorney's fee would be payable from a litigation recovery, and knowledge of the lien would not render the client less creditworthy. Although, in some circumstances, a person might not be willing to take assignment of the judgment (*e.g.*, as collateral for a loan) without knowing the amount owed to the attorney, following the reasoning of *Roberts*, we do not see this as a "grievous loss."

BOP section 10–501(d) spells out that "an attorney . . . may bring an action for execution under the lien only in accordance with rules that the Court of Appeals adopts." Md. Rule 2–652(c) provides for a hearing if the client or interested third party contests the lien after notice is given by the attorney. Although the lien dates from the time the cause of action arises or the proceeding begins, and there is no provision in Rule 2–652 for a hearing until after the attorney gives notice, the Court of Appeals has established a procedure that adequately protects the procedural due process rights of the client. There is no opportunity for the attorney to seize or take possession of his or her portion of the judgment proceeds or settlement proceeds until **after** there has been an adjudication of any dispute relating to the existence or amount of the lien. Applying the principles discussed in *Roberts*, we conclude that the operation of BOP section 10–501 under these procedural rules does not violate Rhoads's procedural due process rights.

### Conclusion

For the foregoing reasons, we reverse the summary judgment entered by the circuit court and remand to that court for resolution of the remaining issues.

**JUDGMENT VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**